UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-10371-smb

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MARC S. DREIER, LLP


  Debtor.

- - - - - - - - - - - - - - - - - - - -x


   United States Bankruptcy Court

   One Bowling Green

   New York, New York


   November 17, 2009

   10:36 AM


B E F O R E:

HON. STUART M. BERNSTEIN

U.S. BANKRUPTCY JUDGE

1

2    HEARING re Status Conference

3

4    HEARING re Interim Fee Application for Counsel to Trustee

5    LaMonica Herbst & Maniscalco

6

7    HEARING re Interim Fee Application for Accountant to Trustee

8    CBIZ Mahoney Cohen

9

10   HEARING re Interim Fee Application for Auctioneer to Trustee

11   David Maltz & Company

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

1

2    A P P E A R A N C E S :

3

4    LAMONICA HERBST & MANISCALCO LLP

5         Attorneys for Chapter 7 Trustee

6         3305 Jerusalem Avenue

7         Wantagh, New York    11793

8

9    BY:  SALVATORE LAMONICA, ESQ.

10         GARY E. HERBST, ESQ.

11

12   U.S. DEPARTMENT OF JUSTICE

13        Office of the United States Trustee

14        33 Whitehall Street

15        Suite 2100

16        New York, NY 20004

17

18   BY:  RICHARD MORRISSEY, ESQ.

19

20

21

22

23

24

25

U.S. DEPARTMENT OF JUSTICE

    U.S. Attorney's Office

    Southern District of New York

    86 Chambers Street

    New York, NY 10007


BY:  LI YU, ESQ.


FOX ROTHSCHILD LLP

    Attorneys for Elisa Dreier

    100 Park Avenue

    Suite 1500

    New York, NY 10017


BY:  FRED STEVENS, ESQ.

P R O C E E D I N G S

THE COURT: Okay. Why don't we move on to the individual status conference?

MR. LAMONICA: Good morning, Your Honor. Salvatore LaMonica. I am the Chapter 7 trustee of Mr. Dreier's individual bankruptcy estate.

Your Honor, when I was first appointed in this case, the initial task was to oversee the wind down of Mr. Dreier's -- what everybody calls the affiliated entities. Those are his interests in law firms that were located in California and several law firms located here in New York. One of the first things I did was to go to California and meet with the former partners of that firm, meet with the comptroller, get an understanding of what the nature of the assets of those entities were. Since that time, we have been working to collect the accounts receivables of the firm that's known as Dreier Stein Kahan Browne Woods & George. It's a long name. To date, I've been successful in collecting approximately 2.2 to 2.3 million dollars in accounts receivable which I am holding. We approximately have another 125,000 dollars in arrangements with former clients of that firm that are making monthly payments on account of their accounts receivable. I've dealt with some claims against those LLPs particularly from former associates seeking unpaid compensation. We've dealt with the trade vendors. And I expect to be completely done

1    with that wind down in the next five or six months.

2        The -- Your Honor has entered several 2004 orders

3    compelling the production of documents and information from

4    some of the partners who were uncooperative at the time.  We

5    have since been able to get the cooperation of the vast

6    majority of them since Your Honor has entered those orders.

7    They had their desired effect except for maybe one or two who

8    are still being a little bit difficult.  They have retained

9    counsel and we are hoping that that will produce some fruit in

10    the near future.

11        In the meantime, we entered into agreements in --

12    with the government concerning the liquidation of the real

13    properties that were held by Mr. Dreier.  Those stipulations

14    were approved by the district court in April and May.  We were

15    able to conduct an auction sale of Mr. Dreier's two homes in

16    Quogue on June 17th, 2009 where we realized 6.8 million dollars

17    for the big house and approximately 3.8 million dollars -- I'm

18    sorry -- 6.6 million for the big house and 3.8 million for the

19    smaller house.  We have since closed those transactions.  I've

20    paid the mortgages that were duly recorded and properly

21    recorded.  I'm still holding the net proceeds of sale from

22    those properties which I --

23        THE COURT:  What are those net proceeds?

24        MR. LAMONICA:  The net proceeds from the three

25    properties are approximately nine million dollars right now.

1    Under my agreements, I'm obligated to turn that money over to

2    the government upon the approval of the fee applications and

3    compensation for the auctioneer, et cetera.

4    During that time, we managed the properties.  I hired

5    security guards to ensure that there was no damage being done

6    at the property.  We've maintained the property in terms of

7    opening up the pool so it would be more sellable, et cetera, et

8    cetera.  Those sales out east, we thought, were very, very

9    successful and produced a substantial benefit.

10    We did ultimately have an auction sale in this

11    courthouse in Judge Lifland's chambers on July 21st where we

12    sold Mr. Dreier's apartment on East 58th Street.  We were able

13    to receive 8.2 million dollars at that public auction sale for

14    that apartment.  Once again, that transaction closed in -- I

15    think the last week of August we were able to close that

16    transaction.  Once again, that is part of the nine million

17    dollars that I'm holding because we paid off the mortgage to

18    Wachovia Bank though we should be turning that money over to

19    the government to part of the victims' compensation fund very

20    shortly.

21    I have about 110, 115,000 dollars of other assets

22    that I was able to pick up and collect in terms of some

23    insurance premium refunds.  Mr. Pomerantz was holding some

24    money that he turned over to me from the liquidation of those

25    receivables.  Still to come, we've identified thirteen million

1     dollars of potential Section 5 actions on behalf of my estate.

2     We are still working with our accountants at CBIZ Mahoney Cohen

3     to further fine tune that and we expect to be bringing Section

4     5 actions very shortly.

5           THE COURT:  Do you have the same dispute with the

6     government regarding --

7           MR. LAMONICA:  No.

8           THE COURT:  -- net proceeds?

9           MR. LAMONICA:  No.  They haven't asserted it yet,

10     Your Honor.  I'm afraid that now that I've let the cat out of

11     the bag -- but as of now, they have not.  These are transfers

12     made by Mr. Dreier from an account that was solely in his name.

13     And we've identified those as potential recovery.  We're still

14     trying to find out who some of the people are but, for us,

15     they're just names.

16           I have not had the opportunity to examine Mr. Dreier

17     under the Section 341.  He is still in transit to his permanent

18     facility in Minnesota.  He's in a stopover in Chicago and it's

19     going to be difficult for me to examine him there.  I'm hoping

20     when he gets to a permanent facility, there will be a

21     conference room there or a phone system we could use to

22     telephonically examine him.  He has been very cooperative with

23     us before he was sentenced.  I met with him on numerous

24     occasions as did the LLP trustee.  And he assisted us in

25     selling property and identifying some of the issues.  There

1    were some disputes over DEC violations out east and various

2    stuff like that.

3         So we've also engaged in numerous discussions with

4    Mr. Dreier's former spouse, Elisa Dreier, concerning the

5    abandonment of a property in Westhampton that Your Honor will

6    see on the docket.  We were also discussing her claim for a

7    domestic support obligation and hopefully come to a resolution

8    of that issue in the very near future.

9         We're continuing our efforts in winding down, if you

10   will, the various entities.  Our accountants just got some

11   reports printed from the servers that the LLP trustee has set

12   up and some documents from the local firms.  So hopefully, that

13   will be progressing to a point where either there's money or

14   there isn't money.

15        THE COURT:  Once you turn over to the government the

16   proceeds of the sales, what's left in the estate?

17        MR. LAMONICA:  I'll have approximately 2.3 million in

18   hand -- 2.4 million in hand plus whatever I get going forward.

19        THE COURT:  Okay.  Does anyone else want to be heard

20   in connection with the status conference?

21        MR. HERBST:  The only thing I'd add, Your Honor,

22   for -- Gary Herbst from LaMonica Herbst -- is that the 2.4 will

23   be net of what has accrued effectively on the administrative

24   expenses to date which would include the estimated commissions

25   at a reduced amount that we had agreed to with the government

1    at 1.5 percent as opposed to three percent, subject to Your

2    Honor's approval, of course.  So that -- just to let you know

3    that that's effectively what would be remaining net of costs.

4            THE COURT:  All right.  Let me get into the fee

5    applications.  And as I understand it, the government has

6    agreed at least to carve out the auctioneer's fees.

7            MR. HERBST:  That's correct, Your Honor.

8            THE COURT:  Any fees or expenses relating to the

9    actual sale process?

10           MR. HERBST:  What we've agreed with the government,

11   Your Honor, is the following.  And the government agreed to --

12   after payment of the auctioneer's commissions expenses and that

13   they would essentially carve out ten percent of the remaining

14   funds for the estate which would essentially cover the

15   outstanding administrative expenses to date plus the

16   commissions that the trustee will seek later on with respect to

17   the three property sales at the reduced rate.  And there will

18   be some excess above that for all the expenses incurred to

19   date.

20           THE COURT:  So the ten percent is after you pay off

21   the auctioneer?

22           MR. HERBST:  That's correct.  And that's the

23   agreement that we've reached with the government with

24   respect --

25           THE COURT:  So I take it there's no objection to

1   paying Maltz & Company, its application, which is a straight

2   commission, right, plus expenses?

3          MR. HERBST:  That -- commissions and expenses.  And

4   the U.S. trustee raised some issues with respect to -- and I

5   guess subject to the reservation of rights that all the parties

6   have put in.  But it's coming out of the proceeds of sale.  But

7   the U.S. trustee had some questions about adding -- some

8   additional information that has been provided in the

9   supplemental application and --

10          THE COURT:  Is there an objection by the U.S. trustee

11   to the Maltz fees and expenses?

12          MR. MORRISSEY:  No, Your Honor.

13          THE COURT:  All right.  I'll allow those.

14          MR. HERBST:  Okay.

15          THE COURT:  The question, though, is really raised in

16   Ms. Dreier's limited objection.  She either has priority or

17   shares pari passu with the other administrative creditors.

18          MR. HERBST:  I can address that, Your Honor.

19          THE COURT:  Okay.

20          MR. HERBST:  Your Honor, Ms. Dreier -- and I'm sure

21   her counsel will also speak to it.  Ms. Dreier had asserted a

22   claim and asserts a claim under her separation agreement which

23   is about a hundred and some odd pages of about 7.1 million

24   dollars.  How --

25          THE COURT:  Hold it down back there, please.  Go

1    ahead.

2            MR. HERBST:  However, Your Honor, what is clear --

3    and we did get some information this morning, which we've

4    looked at, is that the amount of the domestic support

5    obligation accrued as of the filing date is 106,485 dollars --

6    as of the filing date.  Now, we have said that everything in

7    excess of that is essentially in the 502(b)(5) and also under

8    507(a)(1) is unmatured and is therefore not entitled to

9    priority.  And we said that we were more than happy to sit

10   down.  But the number that we -- prepare to work with them and

11   try to resolve rapidly on is the 106,000 dollars.  And we don't

12   have any objection to sitting down and resolving it quickly on

13   presentment to all of the parties that will have their

14   opportunity to look at it and determine whatever that number

15   that's reached is acceptable.  But in excess of that, it's all

16   on the come.  It's all future monies.  And I believe it's

17   pretty clear under the Code, our estimate -- our view of the

18   law is under 507(a)(1), it specifically says fixed as of the

19   filing date.  And then under 502(b)(5) says anything under --

20   the Court will allow a claim except what is unmatured under

21   523 -- I think it's (a)(5) which is domestic support

22   obligations.  So I don't believe that there is any right as

23   priority claim -- 507(a)(1) priority claim for that.

24           Additionally, even if there was, Your Honor, the

25   trustee is administering these assets -- bringing these assets

1    in.  And under 507(a)0(3), I think we'd -- there'd be an

2    entitlement to get paid ahead of the 507(a)(1).  But I don't

3    think you have to go there.

4           THE COURT:  All right.  How have you resolved the

5    issue for today?

6           MR. HERBST:  Yes.  But I don't think you have to go

7    there.  And we certainly have no issue -- again, we've been

8    dealing with Ms. Dreier throughout this case.  We've tried to

9    cooperate in assisting her in a very extraordinarily difficult

10   situation for her and her family.  And we've moved rapidly, I

11   think, on the property and assisted her in getting the meters

12   turned over, the water changed over with regard to the property

13   in Westhampton.  I know there's a significant issue on the

14   satisfaction but -- and we've tried to work through other

15   issues, limited wave runners, the bicycles and some of the

16   cars.  And there's some frustration because it's taking a

17   little bit of time, I understand, to resolve.  But we've had a

18   good dialogue in trying to resolve these and with her counsel

19   and we have no problem sitting down.  If there's other things

20   we need to look at, we certainly have said we'll look at them.

21   If there's other parts of this DSO claim we're unaware of,

22   please let us know.  But we estimated that it wouldn't be

23   probably more than much of a hundred thousand dollars at this

24   point.  And we're prepared to resolve that as rapidly as

25   possible.

1          THE COURT:  Sure.

2          MR. STEVENS:  Your Honor, Fred Stevens, Fox

3    Rothschild, counsel to Ms. Dreier.  I think that what we've

4    come up with -- and I think we have a fairly pragmatic solution

5    to getting through the things that we have to today.  Ms.

6    Dreier has asserted a claim of roughly 7.1 million dollars.

7    There is a dispute and the trustee's outlined it for Your Honor

8    of what exactly is due, what would be entitled to an A(1)(a)

9    priority and also what would be allowed under 502.

10          The issue that we have is whether there was an

11   acceleration of damages under the separation agreement because

12   of the pre-petition default.  If there was an acceleration, the

13   acceleration is allowed and there's no argument for

14   deacceleration.  Then you're going to have a matured -- on

15   the -- a claim on the petition date, a matured claim, for the

16   full amount owed under the separation agreement.  If there was

17   not an acceleration under the contract and -- or there is some

18   other argument, either bankruptcy or other law, that you can

19   deaccelerate then you're going to have a fairly -- much more

20   limited claim that's going to be entitled to the A(1)(a)

21   priority.  I think that, and what we've suggested that I think

22   gets us through today   is -- and what Ms. Dreier's willing to

23   do and she proposes to do is let's get to the amount that we

24   can agree on now that is subject to the A(1)(a) priority.  And

25   the amount that we're saying should not be subject to dispute,

1   subject to the trustee's right to go through it and, of course,

2   other parties' rights to review it, is about 107,000 dollars.

3   That's an amount we don't think there's any dispute over.  If

4   we can agree -- come to an agreement on that and getting that

5   paid at the same time as what we think our junior priority

6   claim and we're -- then we have no objection to consenting to a

7   carve-out under A(1)(a)(c) for the trustee even whether we're

8   approved to have a 7.1 million dollar claim or a hundred

9   thousand dollar claim or something in between in the future.

10  But we can stay that fight off for another day.  It's really

11  just to get us through today, to get us through these three

12  applications.  We come to an agreement on the 107, we can get

13  that paid.  We have no objection to the trustee getting paid or

14  the trustee's professionals getting paid, what they've asked

15  for, subject, of course, to our reservation of rights, the same

16  reservations that every party has until a final hearing.  And

17  that should get us through that problem.  We think it's a

18  practical solution.  And we can worry about the fight on the

19  other stuff for another time.

20          THE COURT:  Okay.  All right.

21          MR. HERBST:  Your Honor, we will -- as we said, we

22  will certainly segregate 107,000 dollars.  We'll make sure that

23  we agree to the amounts I just got.  I don't think there's

24  really much of a dispute.  They're probably going to be pretty

25  close to that.

1          THE COURT:  I don't think he's talking about

2     segregating a hundred --

3          MR. HERBST:  No.  But it has to be presented to Your

4     Honor.  And that's all I'm saying is I have no problem.  We'll

5     come to -- you know, we're going to review the information

6     that's provided, make sure that in the agreement it's

7     consistent with what's allowed under the agreement, which I

8     think it is, but, as I said, we just got this morning.  So

9     we'll go through it very rapidly and I don't think we'll have a

10    difficulty coming to a conclusion on that.

11         THE COURT:  Mr. Stevens, are you satisfied with him

12    segregating 107,000 and working this out?

13         MR. STEVENS:  What I'd like to leave here with today

14    is a very -- I would like --

15         THE COURT:  A check.

16         MR. STEVENS:  I'd love -- that's exactly right.  I'd

17    love a check today.  But what I would like is I'd like everyone

18    in the room to be very interested in getting a solution.  I

19    don't want to hold up the payments to the trustee's

20    professionals.  I want them to get it by year-end if, to the

21    extent, the Court thinks they're entitled to it.  That's not my

22    intent.  But do I want to give up my leverage to keep

23    everyone's feet to the fire about getting this agreement,

24    getting my client the money?  No, I don't want to do that.

25         THE COURT:  All right.  Here's what I will do.  I

1    will grant the Maltz application since that's coming out of the

2    government's -- the forfeitable proceeds.

3                   MR. HERBST:  But so is all of it.  I'm sorry, Your

4    Honor.

5                   THE COURT:  I -- well --

6                   MR. HERBST:  Okay.  I mean, the -- understand that

7    the money that's carved out where the trustee's getting paid is

8    out of the proceeds of those sales of those houses.

9                   THE COURT:  The government is agreeing to pay the

10   legal fees even those -

11                  MR. HERBST:  Well --

12                  THE COURT:  Let me finish.

13                  MR. HERBST:  Sorry.

14                  THE COURT:  -- even those that were not generated in

15   the course of the sale?

16                  MR. HERBST:  Well, Your Honor, what I'm saying is

17   that we carved out the money from there that would cover the

18   administrative costs.

19                  THE COURT:  So let me ask the government since the

20   government is here --

21                  MR. HERBST:  Yeah.

22                  THE COURT:  -- whether there's any objection to

23   paying the legal fees sought today out of the, essentially, the

24   proceeds of the sale and then the net amount is turned over to

25   the government.

1          MR. YU:  No, Your Honor.

2          THE COURT:  All right.  Fine.  That solves it.

3          MR. HERBST:  Okay.

4          THE COURT:  I will allow the legal fees then since

5     they're not coming out of property which would otherwise be

6     distributable to the creditors in this case pursuant to the

7     various stipulations.

8          Now, with respect to your issue --

9        (Pause)

10         THE COURT:  I mean, I guess what we can do is if you

11    don't work it out, you can just make a demand for the payment

12    of an administrative claim and I'll deal with it that way.

13         MR. STEVENS:  Your Honor --

14         THE COURT:  That's your leverage, I guess.

15         MR. STEVENS:  Right.  But I would represent to the

16    Court we're going to sit down and resolve this.

17         THE COURT:  Right.  Right.

18         MR. STEVENS:  This is not -- shouldn't be a need for

19    that.

20         THE COURT:  In the event that it's not.  If it's

21    resolved, fine, but that's your ultimate leverage.  Just demand

22    the payment of an administrative claim and we'll have a

23    hearing.

24         MR. STEVENS:  Understood, Your Honor.

25         THE COURT:  Okay.  Thanks.  You can submit an order.

1          MR. HERBST:  Thank you, Your Honor.

2          THE COURT:  We'll give you another date, though, for

3     the status conference.  January 20?

4          MR. LAMONICA:  Your Honor, just so that there's no

5     confusion, Your Honor indicated that Your Honor was going to

6     allow the attorneys' fees.  There's also an accounting firm

7     applica --

8          THE COURT:  I meant the -- is that also -- government

9     also agree to carve that out?

10         MR. HERBST:  Yes.  It's all part of the amount of

11    funds, Your Honor.

12         THE COURT:  All right.  As long as it's coming out of

13    what you would otherwise turn over to the government, certainly

14    the creditors are not adversely affected by that and it

15    probably helps.

16         MR. STEVENS:  And, Your Honor, whatever your finding

17    in the allowance order -- that they're being paid expressly

18    from the government's funds and not from estate funds?

19         THE COURT:  Well, it should provide for the payment

20    and, I guess, then a turnover of the balance to --

21         MR. HERBST:  That's what we're going to do, Your

22    Honor.  I'll represent on the record that's how it will be

23    done.

24         THE COURT:  All right.  Why don't you just show it to

25    Mr. Stevens and represent that he consents to the order?  If he

1  doesn't then you can settle it on him and you can file an

2  objection.

3          MR. HERBST:  Okay.  I'll give him a copy right now.

4  Your Honor, one clarification?  You set another status

5  conference for --

6          THE COURT:  January 20.

7          MR. HERBST:  That's for both cases?

8          THE COURT:  Yes.

9          MR. HERBST:  Thank you, Your Honor.

10          THE COURT:  Might as well hold these cases together.

11          MR. MORRISSEY:  Your Honor, Richard Morrissey for the

12  U.S. trustee.  A very minor point regarding the fee

13  applications for the attorneys and the accountants.  The

14  LaMonica Herbst firm has agreed to a small reduction based on

15  expenses.

16          THE COURT:  Okay.

17          MR. MORRISSEY:  We had filed an objection --

18          THE COURT:  Whatever they've agreed to.

19          MR. HERBST:  Very clearly, Your Honor, we agreed with

20  U.S. trustee.  We took out the meal charge except for sixty

21  dollars.

22          THE COURT:  They got you.

23          MR. HERBST:  And there was an error on the other

24  thing.

25          THE COURT:  450,000.  They got you on the sixty

1    dollar meal charge.

2            MR. HERBST:  And, Your Honor, I took care of that and

3    we reduced by 2500 dollars any questions they had on vague

4    entries.

5            THE COURT:  Very wise choice.  Okay.  Thank you.

6            MR. HERBST:  Thank you, Your Honor.

7        (Whereupon these proceedings were concluded at 10:56 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           I N D E X

3

4                         R U L I N G S

5   DESCRIPTION                                  PAGE    LINE

6   Maltz interim fee applications granted        17      1

7   Trustee's interim fee application granted     18      4

8   with respect to legal fees

9   Elisa Dreier's claim allowed re $107,000      18      25

10  CBIZ Mahoney Cohen's interim fee application  19      12

11  granted

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

LISA BAR-LEIB

AAERT Certified Electronic Transcriber (CET**D-486)

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  November 18, 2009