UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-15051, 09-10371

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

DREIER LLP,

       Debtor.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

MARC S. DREIER,

       Debtor.

- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         One Bowling Green

         New York, New York


         February 2, 2010

         10:24 AM


B E F O R E:

HON. STUART M. BERNSTEIN

U.S. BANKRUPTCY JUDGE

1

2    HEARING re Motion of Paul Gardi and AIM to lift the automatic

3    stay (08-15051).

4

5    HEARING re Trustee's motion to approve settlement with GSO

6    Capital Partners (08-15051).

7

8    HEARING re Status conference (09-10371).

9

10   HEARING re Chapter 7 Trustee's motion to approve settlement

11   agreement with Sheila Gowan and GSO parties (09-10371).

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Penina Wolicki

A P P E A R A N C E S :

DIAMOND MCCARTHY LLP

    Attorneys for Sheila M. Gowan, Dreier LLP trustee

    The New York Times Building

    620 Eighth Avenue, 39th Floor

    New York, NY 10018

BY:  HOWARD D. RESSLER, ESQ.

    STEPHEN T. LODEN, ESQ.

LAMONICA HERBST & MANISCALCO LLP

    Attorneys for Dreier trustee

    3305 Jerusalem Avenue

    Wantagh, NY 11793

BY:  GARY E. HERBST, ESQ.

U.S. DEPARTMENT OF JUSTICE

    United States Attorney's Office

    86 Chambers Street

    New York, NY 10007

BY:  MATTHEW L. SCHWARTZ, AUSA

1

2    ALSTON & BIRD LLP

3         Attorneys for Gardi Parties

4         One Atlantic Center

5         1201 West Peachtree Street

6         Atlanta, GA 30309

7

8    BY:   JOHN E. STEPHENSON JR., ESQ.

9

10

11   ALSTON & BIRD LLP

12        Attorneys for Gardi Parties

13        90 Park Avenue

14        New York, NY 10016

15

16   BY:   ALEXANDER S. LORENZO, ESQ.

17        CRAIG CARPENITO, ESQ.

18

19   WHITE & CASE

20        Attorneys for GSO Capital Partners LP

21        1155 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   J. CHRISTOPHER SHORE, ESQ.

25        JULIA WINTERS, ESQ.

1

2    FRIEDMAN KAPLAN SEILER & ADELMAN LLP

3         Attorneys for Perella Weinberg Xerion Master Fund

4         1633 Broadway

5         New York, NY 10019

6

7    BY:   ERIC CORNGOLD, ESQ.

8

9

10   KLESTADT & WINTERS, LLP

11        Attorneys for the creditors' committee

12        292 Madison Avenue

13        17th Floor

14        New York, NY 10017

15

16   BY:   TRACY L. KLESTADT, ESQ.

17         SEAN C. SOUTHARD, ESQ.

18

19   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP

20        Attorneys for 360 Networks Estate

21        101 Park Avenue

22        New York, NY 10176

23

24   BY:   T. BARRY KINGHAM, ESQ.

25

1

2   SULLIVAN & CROMWELL LLP

3        Attorneys for Eton Park objectors

4        125 Broad Street

5        New York, NY 10004

6

7   BY:   BRUCE E. CLARK, ESQ.

8

9

10  MARK COHEN, ESQ.

11       Attorney for Fortress and Concordia

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           THE COURT:  All right, we have a critical mass.

3    Dreier.  Go ahead.

4           MR. LODEN:  Thank you, Your Honor.  Steve Loden on

5    behalf of the Chapter 11 trustee.  We noted on the calendar

6    outside that the Court has listed the Paul Gardi lift-stay

7    motion first.  We're fine with that motion being heard first if

8    that's

9           THE COURT:  Why don't we just -- it's intertwined with

10   the settlement, and it's the same issues.  So why don't you go

11   ahead.

12          MR. LODEN:  I'm sorry?

13          THE COURT:  Go ahead.

14          MR. LODEN:  With the?

15          THE COURT:  You can start with the settlement.

16          MR. LODEN:  Okay, Your Honor.  Your Honor the

17   settlement before you today is the product of stark choices

18   that the Chapter 11 trustee faced in dealing with both the

19   government and GSO.  On the one hand, she could have chosen to

20   essentially declare all-out war; war with the government to

21   object to the forfeiture.  That would be a must-win high stakes

22   litigation, that would have been very costly and complex to

23   pursue.  She could have declared war on GSO and sued to recover

24   the full 196 million that GSO received out of Dreier accounts.

25   As discussed in the papers, there were slim facts on inquiry

1  notice plans against GSO, and GSO strenuously argued

2  affirmative defenses to the trustee's claims.

3        THE COURT:  What about the preference claims?

4        MR. LODEN:  Your Honor, we -- as the trustee explains,

5  the preference claims were stronger.  However, there were risks

6  with those claims as well.  For example, the affirmative

7  defense property of the estate.  If GSO prevailed, the

8  transfers from a Dreier LLP account to GSO were not transfers

9  of an interest of the debtor in property; that finding would

10  more than likely or perhaps apply to every other avoidance

11  action that the trustee could bring.  So the risks of

12  litigating that and the unfavorable judgment that could result,

13  was something that the trustee definitely considered.

14        On the other hand, instead of all-out war, the trustee

15  could have pursued settlement, which obviously is what she did.

16  Settlement with the government obtains the government's written

17  agreement to not forfeit over twenty-five million dollars and

18  other profits recovered from net winners.  Settlement with the

19  government results in 9.25 million paid to this Chapter 11

20  estate.  And it's important to note that that payment is free

21  and clear of Wachovia's cash collateral replacement lien.

22        Now, the trustee believes that the proposed

23  settlements are reasonable, and in the best interest, but it's

24  important to remember that the settlements are codependent.

25  With no settlement agreement between GSO and the trustee, there

1   is no agreement between the government and the trustee.

2         THE COURT:  What's the aggregate amount that's

3   preference claims that you believe you have?

4         MR. LODEN:  The estate holds -- I've got it in my

5   notes, Your Honor, bear with me one second.

6         THE COURT:  Aside from GSO?

7         MR. LODEN:  Yes, Your Honor.  Aside from GSO, there's

8   approximately thirty-two million in preference claims.

9         THE COURT:  Okay.

10        MR. LODEN:  Your Honor, no, I apologize.  My notes are

11  incorrect.  No, that's right, that's right.  I had already

12  backed out the GSO exposure for that number.

13        THE COURT:  Okay.

14        MR. LODEN:  So the agreements are interrelated.  And

15  the objecting parties want to say that they should be

16  considered separately.  But the fact is that if the GSO-trustee

17  agreement is not approved, then the estate will lose more than

18  just the 9.25 million that is to be paid in.  The estate will

19  lose the settlement art from the government's forfeiture . The

20  estate will also lose the assurances that the government won't

21  seek to forfeit twenty-five million dollars in net profits.

22  And potentially, we could lose the entire case if the

23  forfeiture is successful -- our objection is unsuccessful to

24  the forfeiture, and the government forfeits all of Dreier LLP's

25  assets as they've threatened to do.

1          Now, the trustee bears that risk.  The trade creditors

2    bear those risks.  But the objecting parties have no risk at

3    all.  Regardless of what happens today, they are going to get

4    their claims in the forfeiture.  They will get their

5    distribution of the 30.8 million that GSO is paying into the

6    forfeiture, regardless of what happens today.  So they really

7    don't have a lot of skin in this fight, Your Honor.  And their

8    efforts to blow up these settlements, really benefits them to

9    the detriment of all the trade creditors who will lose big if

10   the settlement is not approved.

11          Now, the trustee's declaration explains her reasoning.

12   And it was filed and served yesterday.  And the trustee is

13   available today to answer any questions that anyone might have.

14   But in summary of the trustee's analysis, GSO was the biggest

15   investor in Marc Dreier's Ponzi scheme.  So the numbers are

16   going to be larger.  It's just the way it is.  But the analysis

17   of those claims against -- of the avoidance claims against GSO

18   is the same as the analysis of avoidance claims against every

19   other recipient of transfers.

20          Your Honor, I prepared a brief -- a one-page diagram

21   of the transfers.  May I approach?  I have more copies if

22   anyone else -- I've given one to the creditors' committee -- if

23   anyone else would like a copy.

24          (Pause)

25          MR. LODEN:  Your Honor, what this diagram shows --

1    well, before we get to the diagram, recall that during the last

2    status conference I told the Court that we were looking to

3    receive profits plus in resolving the avoidance actions.  GSO

4    invested 165 million dollars into the Marc Dreier Ponzi scheme.

5    And they received back 196 million dollars.  That's the biggest

6    blue circle on this diagram.  Of that 196 million dollars, 62

7    million, the green circle, was received within the preference

8    period.  The difference between the two, 134 million, was

9    received outside the preference period.

10            To look at it differently, when the ninety-day

11   preference window opened, GSO was still in the hole.  GSO had

12   been paid 134 million of its 165 million dollar investment.  So

13   within the ninety-day window, GSO reached the break-even point

14   and received an additional 30.8 million dollars in profits from

15   Dreier LLP accounts.  So the profits -- as this diagram

16   shows -- the profits are completely surrounded and subsumed in

17   the preference exposure.

18            So let's talk about the 134 million outside the green

19   circle, the remainder of the blue circle.  None of that was

20   profits.  So GSO has a good-faith defense to avoidance actions,

21   because the Ponzi presumption does not apply.  The Ponzi

22   presumption of fraud does not apply.  And the trustee looked at

23   that good-faith issue.  And the question was, was GSO on

24   inquiry notice of the frauds.

25            Now as she explai -- as the trustee explains in her

1   declaration, we did see red flags in the documents -- in the

2   deal documents.  For example, we saw that there were

3   confidentiality provisions that prohibited GSO from speaking

4   with anyone other than Marc Dreier about these transactions.

5   We also saw that the Solow financials that had been provided by

6   Marc Dreier were obvious fabrications.  At the outset, they

7   purported to be consolidated financials, but they didn't say

8   what was being consolidated.  Those financials also show that

9   Solow had significant wealth, but raising the question:  Why in

10  the world are they borrowing at above market rates if they had

11  access to liquid assets on their balance sheet?

12       Those documents also show that all cash -- all

13  interest, all principal repayments, everything, happened

14  through a Dreier LLP account.  There was not one single payment

15  from Solow -- obviously from Solow or any other non-Dreier LLP

16  account.  All of that was suspicious in our initial review of

17  the GSO documents.  And importantly, all of those facts apply

18  with equal strength to the objecting parties, because those

19  were characteristics of the deal that were common to every

20  hedge fund investment.

21       So we dug into the GSO documents in further depth.  We

22  looked at the e-mail traffic between Marc Dreier and GSO.  The

23  trustee interviewed Marc Dreier on multiple occasions.  We also

24  reviewed the GSO binders, the documents that Marc Dreier kept,

25  with respect to his dealings with GSO.  And GSO itself made its

1   documents available for review.  None of those reviews, in the

2   trustee's opinion, turned up anything -- any more compelling

3   facts than we had already known, that I've summarized to the

4   Court today, with respect to the inquiry notice claims.

5        So then turning to the green circle, the sixty-two

6   million.  As the Court suggested by its comment earlier, the

7   trustee believes the preference claims were much stronger than

8   the inquiry notice claims.  That is why, under the settlement,

9   GSO is repaying 40.3 million dollars of that preference

10  exposure.  That's sixty-six percent -- just shy of sixty-six

11  percent.

12       In the objecting parties' share in that entire

13  recovery, they share in the 30.8 million that is being paid

14  over to the forfeiture proceeding, and they will also share, if

15  their claims are allowed, in the 9.5 million that is being

16  repaid to this estate.  Again, that's a sixty-six percent

17  return.  And we would suggest or submit that a sixty-six

18  percent return on preference exposure, without a single shot

19  being fired, is inherently reasonable.

20       But, and as noted on the diagram, the settlement is

21  GSO returning its profits plus 9.5 million.  So that is what

22  our goal always was, profits-plus.  And it's been satisfied

23  with this settlement.

24       But the estate is not just getting the 9 -- or the

25  bankruptcies are not just getting the 9.5 million that GSO is

1   paying back.  We're also getting an assurance from the

2   government that they will not interfere with 25 million in

3   profits claims.  We're also getting the settlement art.  So

4   when you add it all together, the 9.5, the 25-plus, and the

5   settlement art, the bankruptcy estates are actually getting 34,

6   35 million dollars in consideration for these settlements.

7        So the objecting parties will share in 34, 35 million

8   dollars to this estate, 30.8 million to the forfeiture --

9        THE COURT:  Well, you haven't recovered the rest of

10  the preference money quite yet.

11       MR. LODEN:  Understood, Your Honor.  Understood.  But

12  the ability to bring those claims unfettered by the

13  government's threats is a significant win, given where we were

14  nine months ago in this case.

15       So the objecting parties will share in over sixty-five

16  million dollars in recoveries -- potential recoveries, claims

17  and recoveries, as the Court notes, as a result of these

18  settlements.  Again, that is entirely reasonable, from our

19  perspective, under any standard.  And as the Court undoubtedly

20  saw, Judge Rakoff indicated yesterday that at least with

21  respect to the GSO-government agreement and the government-

22  trustee agreement, he agrees.

23       Now, the objecting parties say it's unfair because GSO

24  isn't a big enough net loser.  To coin a phrase, they really

25  want GSO to feel their pain.  And the trustee is not deaf to

1    those equitable arguments.  But the code's distribution scheme

2    cannot be set aside because GSO didn't lose enough money.  Just

3    as creditors are treated equally under the code, holders of

4    avoidable transfers are treated equally under the code.  And

5    the objecting parties collectively hold 20.5 million dollars in

6    avoidable transfers, all preference exposure.  That means that

7    they were paid, while employees, landlords, court reporters and

8    other trade creditors did not get paid.

9         THE COURT:  But Mr. Gardi doesn't -- you don't have a

10   preference claim against Mr. Gardi?

11        MR. LODEN:  Mr. Gardi never got a single dollar from a

12   Dreier LLP account, nor did he ever pay a dollar into a Dreier

13   LLP account.  But I'm talking about --

14        THE COURT:  Well, one of his arguments is why should

15   he be treated the same as those who invested in the Ponzi

16   scheme.

17        MR. LODEN:  I don't think he is -- I don't think he

18   should be treated -- I don't think he is being treated the

19   same, because he never put a dollar into the estate.  He is

20   being treated by this estate as --

21        THE COURT:  Well, he --

22        MR. LODEN:  -- a general unsecured creditor, just like

23   the other countless claims that filed for malpractice.

24        THE COURT:  I didn't mean it that way.  I meant it in

25   terms of the bar order that you're seeking.

1          MR. LODEN:  Well, that gets to the automatic stay and

2     property of the estate.

3          THE COURT:  Well, it's also an issue on your

4     settlement, because it's --

5          MR. LODEN:  It is, Your Honor.

6          THE COURT:  -- an element of the settlement.

7          MR. LODEN:  It is, Your Honor.  And I was just about

8     to get to the bar order.

9          THE COURT:  Okay.  Go ahead.

10          MR. LODEN:  I wanted to focus on the reasonability

11     first.  As I was saying, the objecting parties hold 20.5

12     million in preferences.  That means that they were paid before

13     landlords, employees, court reporters --

14          THE COURT:  I interrupted you.  Objecting parties,

15     excluding Gardi, because he's filed an objection.

16          MR. LODEN:  Correct, Your Honor.  Correct, Your Honor.

17     Correct, Your Honor.

18          So they're making equitable arguments, but what is

19     equitable here depends on where you stand.  I would submit that

20     the trade creditors believe that the objecting parties, other

21     than Gardi, are being treated inequitably in this.

22          THE COURT:  What's the amount of the trade debt or the

23     amount that's been filed?

24          MR. LODEN:  The trade debt represents on aggregate

25     approximately twenty-seven percent of the universe of claims

1    against this estate.  The -- and I can put a dollar amount on

2    that.  About 170 million, thereabouts, Your Honor, if my math

3    is correct.

4         Furthermore, talking about the equities here, Your

5    Honor, we haven't done any due diligence other than looking at

6    Marc Dreier's binders, any due diligence with respect to the

7    other hedge fund objecting parties.  So we don't know whether

8    they have clean hands or not when they come into this Court.

9    The point is, courts of equity cannot set aside federal

10   bankruptcy statutes as easily as the objecting parties suggest,

11   if ever.  The trustee hears their pleas.  And as we stated in

12   their papers, we will work with them to reach a resolution.

13   But their equitable arguments are no reason to upset the hard-

14   fought settlements that are before the Court today.

15        Now, with respect to the bar order.  The bar order

16   protects GSO from the constructive trust tracing claims that

17   net losers want to bring.  And we've already seen Gardi explain

18   why it believes it should be able to bring that claim.

19        THE COURT:  Yeah, but Gardi's not a net loser.  He's

20   someone who had a settle -- he claims, that that is a

21   settlement fund that belongs to him.  You can debate whether it

22   belongs to him or JANA at this point, but he's claiming --

23        MR. LODEN:  If --

24        THE COURT:  -- that.  He's not -- he's in a different

25   position.

1     MR. LODEN:  He's -- that fact is different, but the

2  argument he's making and the claims he wants to bring are the

3  same.  If you assume -- and we don't obviously -- but if you

4  assume that Paul Gardi has an equitable right to amounts in

5  Dreier LLP accounts, then his arguments, beyond that

6  assumption, are the same as the net losers.

7     The purpose of the bar order is the same as the

8  purpose of the automatic stay.  It prevents a litigation free-

9  for-all, and it channels all claims against estate assets

10  through this Court.  And those claims to recover avoidable

11  transfers from Dreier LLP accounts are clearly within this

12  Court's jurisdiction.  That's what you held, Your Honor, in

13  Keene, in Schick, and elsewhere.

14     And claims to recover those avoidable transfers, are

15  one of this estate's largest assets.  As we discussed earlier,

16  profit claims, setting aside GSO, the estate holds an

17  additional 32.2 million dollars in profits claims and 32

18  million dollars in preference claims.  Without the bar order,

19  the trustee would lose the ability to settle any of those

20  claims -- or without a bar order as part of future settlements.

21  If the Court doesn't approve the bar order, we would lose the

22  ability to settle those claims.

23     THE COURT:  Are there any limits on the type of bar

24  order I could enter?

25     MR. LODEN:  There are --

1          THE COURT:  In other words, if GSO insisted on a bar

2     order that said they get a complete release from everybody for

3     everything, could I enter that kind of bar order, because it's

4     necessary to the settlement?

5          MR. LODEN:  We believe that if you can -- if there are

6     unusual circumstances, to use the phrase in the Metromedia and

7     Johns Manville case, if there are unique circumstances, that

8     this Court does have that sort of related-to jurisdiction.

9     But --

10          THE COURT:  Even claims unrelated to the bankruptcy or

11     to Dreier?

12          MR. LODEN:  If the claims have no impact upon this

13     estate whatsoever, I don't know how we would establish those

14     unusual circumstances.

15          THE COURT:  Well, GSO wouldn't be willing to do the

16     deal unless you got that kind of a bar order.  That's why I'm

17     asking --

18          MR. LODEN:  Understood, Your Honor --

19          THE COURT:  -- is there a limit on what I can do?

20          MR. LODEN:  -- understood, Your Honor.  And GSO

21     clearly made the bar order a necessary term of the deal.

22          THE COURT:  Okay.  So what are the limits on the type

23     of claims that can be enjoined under a settlement agreement?

24          MR. LODEN:  I'm sorry, you said so there --

25          THE COURT:  What are the -- is there a limit --

1          MR. LODEN:  Yes, Your Honor.  For example, if one of

2     the net losers believed that GSO owed a duty to that net loser,

3     a tort duty, believes that GSO was somehow complaisant in Marc

4     Dreier's frauds and actually fraudulently induced the net loser

5     to enter into the Ponzi scheme transaction, I think we would

6     have a very tough time arguing that this Court has jurisdiction

7     to extinguish that sort of direct claim between a net loser and

8     GSO.

9          THE COURT:  Doesn't your bar order cover that kind of

10    a claim, though?

11         MR. LODEN:  I don't think it does, Your Honor.  And

12    there's a dispute about that.  And GSO is present and can

13    describe their analysis of what the bar order does.  But from

14    the estate's perspective, the bar order prevents third parties

15    from suing GSO to recover the assets that the trustee has

16    standing to recover.  In other words, avoidable transfers.  If

17    you're a net loser and you hold derivative claims, derivative

18    in the sense that you necessarily must claim through this

19    estate in order to make your argument against GSO, the

20    trustee's belief is that's what the bar order prevents.

21         THE COURT:  But Gardi's contention -- I use Gardi

22    because he's in a different situation --

23         MR. LODEN:  Sure.

24         THE COURT:  -- contends it's not property of the

25    estate.  You can't recover it.  In fact, he's the only party

1   with standing to do it.  Or maybe you both have standing.

2          MR. LODEN:  Your Honor, the trustee has demonstrated

3   that the account in this instance, in the Gardi instance, it's

4   account 5966, was titled in Dreier LLP's name, and that it

5   contained comingled funds.  Thus, the presumption that the

6   Court applied in Keene and Schick with respect to ownership of

7   that property, applies.  And it is presumed to be property of

8   this estate.

9          THE COURT:  But in Schick the defendant was unable to

10  trace.  Are you saying that Gardi should have the opportunity

11  to trace?

12         MR. LODEN:  Absolutely.  And I was getting to that.

13  The bar order prevents Gardi and other parties like Gardi from

14  suing GSO to recover those assets.  But what the bar order does

15  not do is deny them the ability to make their constructive

16  trust arguments or equitable tracing arguments.  That's not

17  what the bar order does.  All it says is those arguments have

18  to be made here in this Court, so this Court can determine

19  whether or not the trustee holds both legal and equitable title

20  in the 5966 account, or whether she just holds legal title, and

21  equitable title sits in Gardi's hands, or someone else.  So

22  it's this Court's jurisdiction to make that constructive trust

23  determination, not a state court or some other federal court

24  sitting in another jurisdiction.

25         And the bar order does not prevent Gardi or anyone

1    else -- Perella Weinberg, Concordia, anyone, from coming into

2    this court and making that argument.  And it -- so it doesn't

3    deny them a chance to be heard.  It just gives the trustee the

4    ability to:  1) control the recovery of assets of the estate;

5    and ensure that she has the ability to settle with other net

6    winners to benefit the entire estate.

7          So, Your Honor, in conclusion, the settlements have a

8    lot of moving parts.  There's no way around that.  There's the

9    GSO-government part, there's the trustee-government part, and

10   there's the trustee-GSO part.  If one of those parts fail,

11   everything falls apart for this estate.

12         Now, the U.S. Trustee has not objected to this

13   settlement, nor has the creditors' committee --

14         THE COURT:  The government's a party to the

15   settlement.  They're going to object to their own settlement?

16         MR. LODEN:  I'm sorry?  Well, but the point is, and

17   the point I'm making is, the U.S. Trustee and the creditors'

18   committee, neither of whom have filed formal objections, are

19   the only parties --

20         THE COURT:  I'm saying the U.S. Trustee isn't going to

21   object to the settlement.  The U.S. Trustee's essentially a

22   party to it.

23         MR. LODEN:  What I'm trying -- what I'm saying, Your

24   Honor, is the objecting parties don't have an interest at all

25   in what happens to nonhedge fund creditors in this case.  The

1    parties who do have an interest in those recoveries by those

2    parties, the creditors' committee and the U.S. Trustee, have

3    not objected to this, even though this settlement allows 30.8

4    million dollars to flow only to victims through the forfeiture,

5    as opposed to trade creditors here.

6         Now, I understand that the creditors' committee did

7    raise questions with GSO, and that they've had discussions, and

8    they're going to address the resolution of those questions.

9    But the point I'm making is, the parties who represent the

10   trade creditors in this case have not voiced any opposition.

11   It's just the hedge fund net losers who think GSO is not being

12   forced to feel enough pain.  That's why they're objecting to

13   this.

14        THE COURT:  How do we know who the releasees are under

15   the settlement?

16        MR. LODEN:  The GSO relea --

17        THE COURT:  It's a very, very broadly described

18   category of releasees.  How do we -- how do I -- how does a

19   hedge fund or whoever, know when they're suing somebody,

20   whether or not they're in violation of the bar order?

21        MR. LODEN:  Our understanding -- again GSO can

22   clarify -- our understanding is that that release covers GSO

23   affiliates who were involved in the investments in the Dreier

24   Ponzi scheme.

25        THE COURT:  Why can't you just name them?

1        MR. LODEN:  We have no objection to naming them.  None

2   at all.  If that's what it takes to make the bar order more

3   appropriate, we have no objection to naming them at all,

4   specifically.

5        Your Honor, in conclusion, the settlements are

6   reasonable.  We've gone through -- and again, the trustee is

7   available to discuss her judgment.  We also believe that the

8   bar order is within this Court's jurisdiction, for the reasons

9   discussed.  So unless the Court has any questions, that

10  concludes my presentation.

11       THE COURT:  All right.  Thank you.

12       MR. KLESTADT:  Good morning, Your Honor.  Tracy

13  Klestadt for the creditors' committee.  With Your Honor's

14  permission, I will address the GSO settlement, and my partner,

15  Mr. Southard, will address the Gardi settlement -- the Gardi

16  matter.

17       Your Honor, the committee did not file an objection..

18  We had -- it was a very close call for the committee.  We had

19  prepared an objection but did not file it.  We were concerned,

20  Your Honor, about the information flow.  While the trustee

21  points out in her declaration that the committee was involved

22  somewhat in the negotiations, that was actually earlier in the

23  process.  And when the settlement was announced, we actually

24  were not involved at that time.

25       So we undertook an independent review of the trustee's

1    files as well as documents that were provided to us informally

2    by GSO.  We were concerned, Your Honor, as I said, that this

3    was not above the lowest level of reasonableness.  But through

4    our negotiations with GSO, Your Honor, I'm pleased to report

5    that GSO has agreed to waive its 502(h) claim as part of the

6    settlement.  And with that, Your Honor, we are prepared to

7    state that we believe that the settlement is now above the

8    lowest level of reasonableness, and are prepared to support the

9    settlement.  And I believe Mr. Shore will confirm that GSO will

10    waive its 502(h) claim as part of the settlement.

11            THE COURT:  Okay.

12            MR. SOUTHARD:  Your Honor, Sean Southard, also for the

13    committee, with respect to the Gardi lift-stay motion, to the

14    extent we want to take that on at this point in time.  It's the

15    committee's view, much like that of the trustee, that Mr. Gardi

16    and his entity have no standing here to argue in favor of

17    lifting the stay. And --

18            THE COURT:  Why not?

19            MR. SOUTHARD:  -- and essentially usurp the estate's

20    cause of action.

21            THE COURT:  Well, he's saying it's not the estate's

22    cause of action.  He's saying that the funds -- he had

23    equitable title to that 6.3 million dollars, and he has a right

24    under nonbankruptcy law to trace it.

25            MR. SOUTHARD:  Right.  And we believe, as we set forth

1    in the papers, that in fact, Mr. Gardi never obtained an

2    interest in those funds.

3            THE COURT:  It may be JANA's -- it may be JANA that

4    has the equitable interest.

5            MR. SOUTHARD:  It may, in fact, be.  But it does not

6    appear to be Mr. Gardi, who is the movant here.  He

7    acknowledges in his papers that there was no meeting of the

8    minds.  In fact, it was apparently Mr. Dreier's intervening

9    fraud, with respect to both sides, that resulted in JANA making

10   the transfer into the estate account.  And we don't see that

11   under those circumstances, where there is, in fact, no meeting

12   of the minds and no settlement, that Mr. Gardi obtained an

13   interest that is superior to the estate's interest in those

14   funds, once it hit the estate account.

15           THE COURT:  Did you brief that issue?

16           MR. SOUTHARD:  We did cite to both the -- both Schick

17   I and Schick II --

18           THE COURT:  I don't think those cases necessarily deal

19   with that issue.  Go.

20           MR. SOUTHARD:  We believe that they do, and we also

21   believe that it's clear under many cases, including Whiting

22   Pools and others, that once there's a prima facie case made out

23   under Chapter 5 to avoid transfer, which Schick certainly

24   supports, that there is an estate property interest in that

25   cause of action; and that what Mr. Gardi is essentially trying

1    to do through a lift-stay motion as opposed to, perhaps more

2    properly, and adversary proceeding seeking to determine the

3    interest in that property, he is seeking to lift the stay and

4    say this is not their property, it's ours, and therefore we

5    should be able to go out and sue.

6         What we're saying is there's a prima facie cause of

7    action here which is, in part, being settled at this point, by

8    the trustee.  And he's trying to take that property of the

9    estate interest away.  That's essentially our position on it,

10   Your Honor.

11        THE COURT:  I'll hear from the objecting -- sorry, why

12   don't I hear from the Chapter 7 trustee.  Go ahead.

13        MR. HERBST:  Your Honor, I'll be very brief.  I think

14   Mr. Loden covered very well the rationale on the global number.

15   Our number is much more modest in comparison to this overall

16   settlement.  We're getting 250,000 into the Dreier estate.

17   We're essentially granting a release of claims.  I've laid out

18   in the response papers and the motion, I think, clearly as to

19   why our claims would be a lot more difficult to pursue.  Number

20   one, we don't have a preference claim, because the transfers to

21   GSO were outside the preference statute, assuming that the

22   property in the 5966 account were ultimately to be determined

23   to be property that the Dreier trustee would have, versus the

24   Dreier LLP trustee.  And the account was designated as a Dreier

25   LLP account.

1          We've read your Schick case.  We think that if it

2    would be creating certain hurdles that we would have to

3    overcome, it would by necessity require a litigation between

4    the two trustees as to who should be distributing the money;

5    and then by necessity would require a litigation with the

6    government and also with GSO.  This resolution -- and I think

7    Ms. Gowan put it correctly -- was quite contentious in the late

8    hours to finish off the settlement.  We reached a number we

9    thought was appropriate for this estate.  We would have

10   difficult claims.  We think that the best claims would lie in

11   the Dreier LLC estate.  But we weren't going to give a release

12   for nothing.  So we negotiated the 250,000 dollar sum.  And I

13   think the settlement, from our perspective, clearly rises above

14   the lowest rung of reasonableness, given the issues that would

15   be raised in defense of our claims.

16          Second issue was essentially raised with respect to

17   the bar order.  I know that's been addressed.  The only

18   distinction raised was whether Your Honor can enter a bar order

19   in a Chapter 7 versus Chapter 11.  I believe the case law is

20   clear that you can do that if it meets the requirements of

21   unique circumstances, which this case, I think, abundantly

22   does, and satisfies those requirements of being unique and

23   extraordinary.

24          And it is a component part of any settlement, unlike

25   the cases where the Court found that the release -- a bar order

1    would be appropriate, but did not grant the bar order because

2    it was the trustee agreeing to use his best efforts.  In this

3    case, it's not a best efforts issue, it's a requirement

4    component of the settlement.  And therefore, if there is no bar

5    order, there is no settlement.  And therefore, under those

6    circumstance, we believe that Your Honor has the power and the

7    authority.  And the issue that Your Honor has to deal with,

8    with the question, is with the scope of the bar order.

9            THE COURT:  Thank you.

10           MR. HERBST:  Thank you.

11           MR. CLARK:  Good morning, Your Honor.

12           THE COURT:  Good morning.

13           MR. CLARK:  Bruce Clark for the Eton Park objectors.

14   Your Honor, I'd like to start with the actual words describing

15   the bar order, because there's obviously some misunderstanding

16   or misapprehension as to what's in there.  The mechanism for

17   the bar order would be developed through the order that's going

18   to be presented to you, as was attached to the papers.  And

19   basically that says that "All creditors, parties-in-interest,

20   and any entity or person that files a proof of claim, shall be

21   enjoined from commencing all causes of action as defined in the

22   GSO agreement, against the GSO releasees, as defined in that

23   agreement, and relating to Dreier LLP and the note-fraud funds

24   as defined in the agreement."

25           So you have to go to the agreement to get the full

1    flavor of what is being agreed to.  And what that says is as

2    follows:  "There will be an injunction entered enjoining any

3    and all creditors, parties-in-interest, and any entity or

4    person that files a proof of claim in the Chapter 11 case or

5    the Chapter 7 case, from commencing or continuing any and all

6    past, present or future claims or causes of action, including

7    any suit, petition, demand, or other claim in law, equity or

8    arbitration, and from any and all allegations of liability or

9    damages, including any allegations of duties, debts,

10   reckonings, contracts, controversies, agreements, promises,

11   damages, responsibilities, covenants or accounts, of whatever

12   kind, nature or description; direct, indirect, in law, equity

13   or arbitration, absolute, contingent, in tort, contract,

14   statutory liability or otherwise; based on strict liability,

15   negligence, gross negligence, fraud, breach of fiduciary duty

16   or otherwise; including attorneys' fees, costs or

17   disbursements, that's defined as claims or causes of action

18   against the GSO parties, their affiliates, directors, officers,

19   employees, representatives and agents, in respect of past or

20   present, direct or indirect stockholders, affiliates, limited

21   partners, investors or other equity holders in any entity

22   controlled or managed by any GSO party," everybody who's come

23   before, "and each of their successors, assignees, and

24   transferees, and each of their respective past or present

25   officers, directors, employees, agents, legal representatives,

1    privies, representatives, accountants, attorneys, any party

2    subject to an indemnity relating to Marc Dreier, Dreier LLP and

3    the note-fraud funds, by a GSO party, owed to the GSO

4    releasees, relating to Mark Dreier, Dreier LLP, and the note-

5    fraud funds; and releasing and forever discharging all GSO

6    releasees from any and all claims and causes of action, known

7    or unknown, that are, have been, could have been or might in

8    the future be asserted, against any of the GSO releasees

9    relating to Marc Dreier, Dreier LLP, and the note-fraud funds."

10            Now, I don't believe that language can be accurately

11   characterized, consistent with the way counsel for the Chapter

12   11 trustee just described it.  That's not what the words say.

13   It's simply too broad, and especially, under the case law in

14   the Second Circuit.  In Metromedia, the Second Circuit laid out

15   the rule that in bankruptcy cases, "The Court can enjoin a

16   creditor only when the injunction plays an important part in

17   the plan."  And I'll get back to the plan in second.  "A

18   release of this sort is proper only in rare cases."  The

19   specific language that Metromedia criticized was that the

20   release there released actions whether for tort, fraud,

21   contract, violations of federal or state securities laws or

22   otherwise, whether known or unknown, foreseen or unforeseen,

23   liquidated or unliquidated, and so forth.

24            It's the same language that's in the settlement

25   agreement that you are being asked to approve today.

1          THE COURT:  Could the bar order simply enjoin all

2   claims relating to any transfers by Dreier or Dreier LLP to

3   GSO?

4          MR. CLARK:  I think that would be more defensible.

5          THE COURT:  So what's really the difference between

6   that and this?  What other claims could there be?

7          MR. CLARK:  Whatever claims any party-in-interest

8   would have against GSO related to Dreier.  And that's part of

9   the problem.  You don't know what they are, and I don't know

10  what they are.  And that's has been criticized in the cases.

11  It was criticized in Metromedia, and then again in the

12  Travelers appeal.  And, you know, you're just being asked to

13  approve something that's sort of a shot in the dark.  And it's

14  not that there couldn't be an order of some sort devised that

15  might be appropriate, but --

16         THE COURT:  So what do you think that is?

17         MR. CLARK:  Well, I'm not going to draft it for the

18  trustee and GSO.  I think -- you know what I think it should

19  be, Your Honor?  It should be in a plan.  And the difference

20  here --

21         THE COURT:  What about the Chapter 7 case?  There is

22  no plan in a Chapter 7 case.

23         MR. CLARK:  I think the Chapter 11 case is our real

24  problem here.  I understand the difference.  The reason --

25         THE COURT:  So you're saying there couldn't be a bar

1    order in a sale order?

2         MR. CLARK:  I think -- well, a bar order of this

3    magnitude?  If it's related simply to the assets that are being

4    sold, possibly.  But you could certainly tailor it a lot better

5    than this has been tailored, even in that situation.

6         And the reason I mention a plan is that for one thing,

7    Metromedia dealt with a plan.  And it didn't say we only mean a

8    plan, we don't mean any other instance.  But it was pretty

9    clear that it was only going to approve that kind of a bar

10   order in the context of a plan.  And the reason I think that

11   makes a difference is because when you're dealing with a plan,

12   you're dealing with disclosure requirements that are very

13   comprehensive.  And we don't have that here.  It hadn't

14   happened here.  Until we made a fuss about it, we didn't get

15   the trustee's declaration until yesterday, saying at least what

16   she did in the last six months and how this evolved.

17        The numbers that came out this morning about what the

18   preference claims are and that sort of thing, the last filings,

19   the statement of financial affairs a year ago and the other

20   materials that have been filed, they don't reveal anything like

21   a twenty million dollar preference claim against the objectors.

22   The number that's revealed in the statement of financial

23   affairs and the list of people who got paid within ninety days

24   is about four million.  Now, it could be that that things have

25   developed since then --

1          THE COURT:  But how can that be, if GSO got sixty-five

2     million?

3          MR. CLARK:  They got sixty -- I think it's sixty-two,

4     actually.

5          THE COURT:  So how can the statement of financial

6     affairs say only four million?

7          MR. CLARK:  For the objectors.

8          THE COURT:  Oh.

9          MR. CLARK:  GSO is not objecting.  I mean, some of the

10    other numbers that came out today about what claims are here,

11    someone else apparently got profit of thirty-odd million.

12    That's news.  I haven't seen that in any of the filings up to

13    now.  So the existence of comprehensive, more specific and more

14    accurate information is something you would presumably have in

15    a plan, and not here.  And the other aspect of that is you know

16    how people are going to be treated, people who are similarly

17    situated, other victims like my client, for example.

18         The problem with this, or one of the problems with

19    this is that it's simply encouraging litigation against the

20    people who lost the most money.  It guarantees that they're

21    going to lose more even if it's just through costs.  And it

22    puts them in an inferior position to GSO, who's getting out

23    with ninety-four percent of what it invested.

24         Now, the trustee can't give us that deal, because to

25    give us -- I'll give up my profits, because I had none.  It's

1    not a great concession.  But to put my client in a position

2    where they would have ninety-four percent of what they

3    invested, the trustee would have to pay me seventy million

4    dollars.

5         THE COURT:  But the bankruptcy's not going to do that,

6    and the trustee has an obligation to bring preference claims.

7         MR. CLARK:  Well, not always.

8         THE COURT:  And if you got paid within ninety days on

9    an antecedent debt, you're going to be a preference defendant.

10   That's just the way the law's written.

11        MR. CLARK:  Well, that -- the statute says that the

12   trustee is authorized to do that.  It doesn't say the trustee

13   must.  And there are circumstances in some cases -- I admit

14   they're limited -- where in fact, a court in your situation has

15   decided not to do that.  There's a district court case, Your

16   Honor, in Arizona, American Continental against All Preference

17   Defendants, 142 B.R. 894.  It was a Ponzi scheme case.  And the

18   Court said these defendants or potential defendants, they've

19   lost enough.  I'm not going to authorize this.  I'm not going

20   to permit it.  And especially here, I think it's something that

21   you are entitled to ponder.

22        THE COURT:  Fair enough.  But can't you raise that as

23   a defense when, as and if the trustee sues you?

24        MR. CLARK:  Well, this is more a general problem.  It

25   would be a problem for my client if they got sued, and we could

1    raise that as a defense then.  But I think if you look at the

2    entire estate and the practical effect of what's going on here,

3    you might pause for a minute before you authorize this.

4         Here are the numbers; here's the way it works.  This

5    sixty-two million dollar preference claim against GSO is

6    probably the largest claim that the estate has.  As far as I

7    know, the objectors have preference claims that are much, much

8    smaller than that.  The thirty million dollars that is going to

9    be forfeited, is being treated as though this is a new transfer

10   of some sort, a new give-up, by GSO.  That money was forfeited

11   subject to forfeiture and over in the forfeiture bailiwick

12   quite some time ago.  They're just going to keep it.  It's not

13   as though there's new money going over.

14        THE COURT:  Who's going to keep it?

15        MR. CLARK:  The U.S. Attorney's Office and the --

16        THE COURT:  Isn't it going to be distributed to the

17   clients and the other victims?

18        MR. CLARK:  Among others, that's true.

19        THE COURT:  All right.

20        MR. CLARK:  But it's already there.  It's already

21   there.  What's left at issue, even if you think you should back

22   out the thirty million, is another thirty million.  And they're

23   paying 9.25.  Now, we can't know at this stage what any of the

24   other losers, the people who lost the most in this case, are

25   going to get.  And I think it's relevant whether or not our

1  people are treated differently at the end of the day, when in

2  terms of conduct, in terms of other things, they are in fact

3  the same as GSO.

4      Moreover, we have -- I'm just talking about the

5  objectors that we identified in our papers.  We have something

6  like sixty-four percent of the claims that are in the claims

7  register.  The Perella people have another eight percent.  They

8  were not included in our chart.  And the creditors, who are on

9  the target list -- there was an Exhibit number 2 to the

10  government's application that you saw, of course, in the

11  hearing over in Judge Rakoff's courtroom -- there were eighty-

12  two targets there.  And if you add up the claims they have put

13  in, this entire group of potential targets has 82.4 percent of

14  the claims in this case.

15      Now, where does that put us?  We haven't had a fee

16  application that I know of, that the docket discloses, since

17  July.  If you'll read the trustee's report of yesterday,

18  there's been a lot of work done.  In fact, when I read that, I

19  said -- I went back to the title, trying to see if this was a

20  fee application or what.  There will be a big application for

21  that, and presumably the creditors' committee will want some

22  compensation.  And I'm not saying they're not entitled to it.

23  But that's where a good chunk of this 9.25 is going to go.  And

24  if there are eighty-two targets of these avoidance actions,

25  that's where almost all of that money could go.

1       I know Your Honor looks at these things and will

2  probably keep control of it. But it's going to be a very

3  expensive process. Anyway, so at the end of the day --

4       THE COURT: So what are you proposing, they just shut

5  down the estate now?

6       MR. CLARK: I'm proposing that you not approve this

7  settlement until you get the information that you would be

8  entitled to.

9       THE COURT: What more information do I need?

10      MR. CLARK: I think you need to know exactly what are

11  the claims, what are the avoidance claims that they intend to

12  pursue, and what amounts -- you don't have that. The numbers

13  you were given this morning are not the same as what is on the

14  claims register or on the ninety-day list. And I think you

15  also need to know what the amounts would be paid from the other

16  victims here, if they were going to be treated similarly to

17  GSO, so you could see whether or not you're really dealing with

18  an effective plan of recovery and distribution.

19       I suspect you're not, because at the end of the day,

20  if I'm right in my numbers, based on the information that's

21  been filed, if the targets have got eighty-two-plus percent of

22  the claims in this case, you're just circling money. The only

23  thing that's going to --

24      THE COURT: But isn't that the purpose of preferences?

25  You bring back the money that's paid within ninety days, and

1    then you distribute it equitably to everybody.

2         MR. CLARK:  I can't disagree with that.  In the

3    abstract.

4         THE COURT:  That's --

5         MR. CLARK:  That's what the statute says.

6         THE COURT:  -- and if I extended your logic, you would

7    argue that a vendor who lost a lot of money and happened to get

8    paid within ninety days, shouldn't be forced to give it back,

9    because he's lost more money than everybody else.

10        MR. CLARK:  I think there are two differences here.

11   First of all, there are others who are situated so similarly to

12   the person whose settlement you're being asked to approve.

13   That's one thing.  And the other is, there's no information

14   about how those people are going to be treated and what's going

15   to come out in their --

16        THE COURT:  When you say how they're going to be

17   treated, do you mean whether the trustee is going to sue them

18   or how they're going to be classified under a possible plan?

19        MR. CLARK:  I think at the end of the day, how much

20   more they will have to pay or under what format, in the

21   trustee's plans.  I mean, this is the largest preference claim

22   you've got.

23        THE COURT:  But can't you tell that just by looking at

24   your books and records, figuring out what you received within

25   ninety days from Dreier LLP, or in the unlikely event, the

Dreier estate?  That's what you're exposure is, presumably.

MR. CLARK:  Well, you know what the risk is.  But you don't know -- you've got eighty-two percent of the people who are in this room being represented as creditors are targets of this.  There comes a point, and I think eighty-two percent probably passes it, where we're just running in circles.

I mean, maybe the most effective thing to do here is to put together a proposal that would embrace all of these objectors and treat everybody the same, and get out of this without spending the nine million dollars on litigation fees.

And the other point, going back to the main point and the first point is, the bar order that's in here simply cannot be approved as it's written, under Manville and Metromedia.  It is precisely this kind of bar order that they prohibited, even in a plan, let alone here where you don't have the same information.  And that's really -- those two things are really the essence of our point.

THE COURT:  Okay.  Thank you.

MR. CORNGOLD:  Good morning, Your Honor.  I'm Eric Corngold from Friedman Kaplan for Perella Weinberg Xerion Master Fund.

I'm not going to repeat the arguments that you just heard.  I think it's clear that the release is too broad as it's written and has to be rewritten under the Second Circuit law.  I just want to make a point about Metromedia and the

1    state of the law in the Second Circuit after Metromedia.  I

2    mean, of course, in the Ninth or Tenth Circuit, these releases

3    just couldn't even be an issue, they're not permitted.  Not --

4              THE COURT:  We're not there.

5              MR. CORNGOLD:  -- not our circuit.  What Metromedia --

6              THE COURT:  Although California might be very nice

7    this time of year.

8              MR. CORNGOLD:  -- it's -- you know, it's rainy.  It's

9    always rainy in California.

10             What Metromedia does, and the logic of Metromedia, is

11   say that a release has to be necessary to a plan, not necessary

12   to a settlement.  The trustee --

13             THE COURT:  So it doesn't apply at all to this case,

14   then?

15             MR. CORNGOLD:  --it doesn't apply -- no, no, no.  The

16   logic of Metromedia is that with a plan, you know where

17   everybody stands, and so releases make sense when you know

18   where everybody stands.  The releases just don't make sense,

19   and the logic of Metromedia I think is strong, that releases

20   don't make sense in a first-in case -- in a first-in settlement

21   that's necessary for that settlement --

22             THE COURT:  Can I ask you a question?  Could the

23   trustee commence a litigation and settle that litigation or

24   release the party that its litigating with, under the

25   settlement?

MR. CORNGOLD: With the trustee, certainly. The trustee can -- but for the trustee --

THE COURT: So this is just expanding the scope of the release, isn't it?

MR. CORNGOLD: It's releasing claims that third parties might have against other third parties. And the code doesn't permit that. And that's what Metromedia says, the code doesn't permit that in the context of where it's not unique and where it's not necessary for a plan. It --

THE COURT: So you're saying there can be no releases in sale orders, for example?

MR. CORNGOLD: If the -- you know, I think the logic of Metromedia with respect to sale orders has to be sort of where in the chronology they take place. If we're talking about at the end of a process where the parties or the bulk of the parties know where they stand -- and that's really what I think we've all been hitting at -- then it makes -- then releases may make sense. And that's when the exceptional use of releases that Metromedia says may be permitted, make sense. But at the beginning of the day --

THE COURT: Well, let me stop you. We get many sales in this Court within the first sixty days of a Chapter 11 case. Are you saying that those sale orders can't contain releases?

MR. CORNGOLD: No, they can contain releases. But if they contain releases that have the breadth that these releases

1    have, stopping third parties from going after the other

2    parties, I think Metromedia and the Second Circuit don't want

3    that to happen.

4         The only other point I think I would make is, the

5    argument that the trustee is making about permanent releases,

6    using stay -- the automatic stay as an analogy are just -- it's

7    conflating two very different concepts.  Of course, the

8    automatic stay is in place.  But that doesn't mean -- and what

9    Metromedia tells you, and what the Second Circuit tells you, is

10   that doesn't mean that the permanent releases that bar for life

11   third-party claims against other third party claims, should be

12   permitted.  And that's, I think, the problem besides the

13   breadth of this bar that we face here.

14        THE COURT:  Thank you.

15        MR. COHEN:  Your Honor, Mark Cohen for Fortress and

16   Concordia.  I simply join in Mr. Clark's comments, in

17   particular his comments about the scope of the -- breadth of

18   the release.  And not to redo it, but the way affiliates are

19   defined, that picks up Blackstone, which is a public company,

20   and every indirect and direct shareholder of Blackstone.  So

21   that if you trace through the release as drafted now, it's very

22   broad and goes beyond Metromedia and the other cases.  And I

23   won't repeat the arguments Mr. Clark has made.  Thank you

24        THE COURT:  Anybody else want to be heard in

25   opposition to the settlement?

1          MR. STEPHENSON:  Your Honor, John E. Stephenson with

2     Alston & Bird on behalf of Paul Gardi.  May I speak from here,

3     Judge --

4          THE COURT:  Sure.

5          MR. STEPHENSON:  It's metaphorical, I think, that I'm

6     sort of over here behind the bar and everybody else is up

7     there, because we aren't like anybody else --

8          THE COURT:  More of an allegory, I think.  Go ahead.

9          MR. STEPHENSON:  Because we aren't like everybody

10    else, and I appreciate the questions that the Court directed to

11    the movants with respect to the distinctions that my client has

12    with regard to everyone else.  I would echo what's been argued.

13    In our opposition papers there are a number of common positions

14    that we take with the objectors from whom you already heard,

15    principally that there's no subject matter jurisdiction or

16    Johns Manville for the bar order that they proposed, that even

17    if a form of bar order were permissible, the bar order that Mr.

18    Clark appropriately spent the time going through, I'd

19    underscore something that I would say more shortly, if you'll

20    forgive me and indulge me for colloquialism, I was born and

21    raised in the rural south and --

22          THE COURT:  I thought you were from Brooklyn.

23          MR. STEPHENSON:  -- that release, Your Honor, is what

24    Baptist preachers call in the south, broad as the power of

25    salvation.  You could not conceive of a release more broadly

1    drafted.  So in favor of the releasors, you can't do better.

2    But if you are those who had claims that would be barred, you

3    couldn't do worse.  And that's what I'm really here to talk

4    about, Your Honor, and those are --

5         THE COURT:  Let me ask you a question.  Suppose the

6    trustee sues GSO, hits a home run and recovers the whatever it

7    is -- thirty-million, let's assume -- what's left.  Could you

8    still bring a tracing claim against GSO?

9         MR. STEPHENSON:  Against GSO directly?

10        THE COURT:  Yes.

11        MR. STEPHENSON:  If all the money had already been

12   paid, my -- here's the problem, here's the problem.  I have a

13   claim that is in conflict with, it competes with the claim that

14   the trustee presumes to settle in this settlement, which has

15   all of the problems that everyone has already identified and I

16   won't belabor.  But we don't know anything about the level and

17   nature of the due diligence, except for Ms. Gowan's declaration

18   that they kindly served at some point late yesterday.  We don't

19   know anything about the nature or the scope of all the parties

20   who may be released, which again, goes far broader than is

21   necessary.  And we can't contemplate who all that they may be.

22   And so the settlement that she undertakes is so much broader

23   than is necessary, and we know so little about the nature of

24   her investigation and due diligence, that that creates that

25   problem.

1          But fundamentally, these aren't her claims to

2     compromise.  And that is my point.  I have in common with the

3     other objectors all the positions that they've argued.  And

4     those defects are fatal to the proposed settlement, I

5     respectfully submit.  But I have, beyond that, the fundamental

6     proposition that the trustee presumes, without any evidence,

7     without any real effort to present legal argument, and

8     certainly with no hearing where the Court or a court of

9     competent jurisdiction could adjudicate claims, determines

10    whether they own the claims they intend to settle.

11         THE COURT:  Well, they have legal title to the funds

12    that were transferred, don't they?

13         MR. STEPHENSON:  Maybe they do.  And I'm not going

14    to -- I'm not going to quibble with that.  But I would submit

15    to you, as the Chapter 7 trustee has raised and others have

16    identified in earlier pleadings, it's not altogether clear that

17    Dreier LLP owns 5966, that account, the account through which

18    all the fraudulent funds --

19         THE COURT:  Who do you think owns it?

20         MR. STEPHENSON:  Marc Dreier individually controlled

21    that account.  Marc Dreier directed all of the transactions in

22    that account.  And as far as I know, because we don't have any

23    evidence, because we haven't been able to take any discovery

24    about it, all of the money that went into that account is the

25    result of --

1          THE COURT:  Well, wait a minute.  When was this motion

2     filed?

3          MR. STEPHENSON:  Pardon me, which motion?

4          THE COURT:  The present motion.  You've had ample time

5     to take discovery.

6          MR. STEPHENSON:  Our motion to lift stay?

7          THE COURT:  The motion to approve the settlement.

8     They've raised the same issues.

9          MR. STEPHENSON:  January 8th, Your Honor.

10         THE COURT:  All right.  Did you try and take any

11    discovery since January 8th?

12         MR. STEPHENSON:  We did not, Your Honor.

13         THE COURT:  All right.

14         MR. STEPHENSON:  We did not.  But I'm not here to

15    argue about the legal title issue, only that there hasn't been

16    any evidence other than the Dreier LLP name is on the account

17    to determine whether they have legal title in fact.  But that's

18    to the side.  There is no --

19         THE COURT:  But how does that make a difference if the

20    Chapter 7 trustee, who would be the only other party to assert

21    that right, supports the settlement also?

22         MR. STEPHENSON:  And it doesn't, I think, in the

23    circumstances of this proposed settlement, which why I'm not --

24    I'm not here to quibble about the proposition of legal title.

25    But what is not in dispute, Your Honor, is that the Dreier LLP

1    estate has zero equitable title to those funds.  Those funds

2    indisputably came from a thief.  That thief, as Your Honor has

3    noted in your own opinions, can't transfer legal record for

4    title.  And there is no doubt that the Chapter 11 estate has no

5    equitable title to those funds.

6         THE COURT:  Well, but you know, there's a lot of law

7    on Ponzi scheme cases which say that if the account is

8    comingled, you don't trace all those who are similarly

9    situated, basically are unsecured creditors with respect to

10   that account.

11        MR. STEPHENSON:  Which, as Your Honor knows, it's our

12   position, we are not.  We are not Ponzi scheme victims.  We are

13   not one of those who are similarly situated.  We were in a

14   unique position vis-a-vis Marc Dreier.  He was my client's

15   lawyer.  He was owed a fiduciary duty.  He never voluntarily

16   transferred any funds --

17        THE COURT:  Has your client ratified that settlement

18   with JANA?

19        MR. STEPHENSON:  Pardon?

20        THE COURT:  Has your client ratified the settlement?

21        MR. STEPHENSON:  No.  And, Your Honor, here's the

22   thing about --

23        THE COURT:  So isn't it JANA -- doesn't JANA have a

24   greater interest than your client in those funds?

25        MR. STEPHENSON:  We will only know when that issue is

1      determined by a court of competent jurisdiction, which is why

2      we've moved to lift the stay.

3            Here's the point.  The facts about that are ultimately

4      not in dispute, but the legal interpretation of those facts

5      will very much be in dispute.  We know that JANA takes the

6      position that the risk of loss with respect to the transfer of

7      the 6.3 million dollars is with my client.  They take that

8      position because they say, we dealt with your lawyer who had

9      actual or apparent authority.

10            It's ironic that the creditors' committee tries to

11      argue that we have no claim or standing to the 6.3 million,

12      while arguing in their papers that Marc Dreier had actual and

13      apparent authority to act on our behalf.  They actually have it

14      exactly wrong.  Under New York law, the issue of whether that

15      settlement is binding on my client turns on the question of

16      whether Marc Dreier had actual or apparent authority to enter

17      into it at the time that he did.

18            And under New York law, it's also without dispute that

19      that is an intensive fact and circumstance investigation.  We

20      need that issue to be resolved.  We need that issue to be

21      resolved because if we, in that litigation, a court of

22      competent jurisdiction determines that Marc Dreier was -- did

23      not have apparent authority, then JANA has the risk of loss.

24      And JANA is the claimant to the 6.3.  But by the same token, we

25      have a 6.3 million dollar claim against JANA.  So that is one

1    way that that can be resolved.

2           Alternatively, owing to facts and the circumstances, a

3    court of competent jurisdiction could determine that Marc

4    Dreier did have apparent or actual authority to bind my client

5    to a settlement, in which case, without any doubt, we're the

6    beneficial owner of the 6.3 million.  And you cannot blithely

7    blow by that legal and factual determination, which is

8    precisely what the settlement, as proposed, would do.

9           And what we say, Judge, is a court of competent

10   jurisdiction must hear the facts.  They must consider the law

11   and they must decide if Paul Gardi or the Gardi parties, is the

12   beneficial owner of the 6.3 million.  Then we reach the

13   question of can we trace.

14          And all we have, with all respect to the Chapter 11

15   trustee, is the broad characterization that oh, my gosh, these

16   funds are hopelessly comingled.  Well, they're not.  They're

17   not as it relates to our money.  And the chart that we

18   submitted to Your Honor in connection with our moving papers,

19   traces simply, in two steps, exactly where the money is.  On

20   day one there's 41,000 dollars.  Our 6.3 or the 6.3 that is at

21   issue here, the 6.3 million dollars that the estate has no

22   claim to, equitably anyway, that 6.3 goes in and then there are

23   transfers out.  And we can see exactly where they went.

24          And because it compounds the problem with the proposed

25   settlement, we know that substantially all of that money went

1    to GSO parties, broadly defined.  And so we believe we may be

2    determined to be the equitable beneficial owner of those funds,

3    with standing to pursue it directly.  The funds are in fact

4    traceable.  We traced them to the parties that would enjoy the

5    broad bar under the proposed settlement.  And we would be

6    precluded from recovering those monies.  And that is as

7    profoundly an inequitable result as could possibly be fashioned

8    against my client.

9         And at the end of the day, we need these issues

10   resolved -- and I know Your Honor shares precisely this

11   interest -- in the legally correct way, with the proper

12   procedure and own evidence.  And right now, we have none.  And

13   the reason that we move to lift stay -- there's some quibbling

14   about whether that's procedurally appropriate or not.  Should

15   we have filed an adversary proceeding, because we are

16   fundamentally challenging whether an asset belongs to the

17   estate or not?  And that's true.  That's true.  But our

18   problem, Your Honor, is we are unsure of this Court's subject-

19   matter jurisdiction to adjudicate that claim.

20        Now, I'm not suggesting that that claim is not a core

21   claim over which the Court could exercise jurisdiction, that is

22   if it is an asset of the estate.  But we have a stakeholder in

23   that proposition who is not before this Court.  JANA has filed

24   no proof of claim.  They made that strategic -- what I can only

25   imagine was a strategic decision to take the position that they

1    settled with Paul Gardi by dealing with his lawyer, who they

2    claim had apparent authority, and when they wired the money at

3    his instruction, the risk of loss transferred from them to the

4    Gardi parties.

5           So we filed our proof of claim, which is contingent,

6    on its face, on the outcome of the legal analysis of whether

7    we're the beneficial owner or JANA is the beneficial owner.

8    But JANA is a necessary party to the adjudication of that

9    question.  If this Court can exercise subject-matter

10   jurisdiction over JANA on that proposition, we are more than

11   happy to proceed before Your Honor, and I see the efficiencies

12   in doing so.  And we're prepared to do that -- to have you hear

13   the evidence and make the decision about whether the Gardi

14   parties are the beneficial owners of the 6.3 million or JANA is

15   the beneficial owner of the 6.3 million.

16          But a court of competent jurisdiction has to do that.

17   I am uncertain about the Court's subject-matter jurisdiction.

18   JANA, I would expect, would object to it.  They didn't file a

19   proof of claim.  They haven't appeared here.  And while there's

20   personal jurisdiction over them, they may take the position

21   there's no subject-matter jurisdiction on that question, or

22   they may demand a jury trial.  And those are things we don't

23   know.

24          I simply want to get that issue joined.  I want to get

25   it joined immediately.  I want to take discovery on it as

1    expeditiously as possible.  And I want this Court or a court of

2    competent jurisdiction, be it the district court or the supreme

3    court in Manhattan, to deliver an opinion, binding on all the

4    parties, collateral estoppel to everyone, so that there's no

5    piecemeal litigation, so that we're not at risk of being

6    whipsawed by receiving a judgment in one proceeding that we are

7    not the beneficial owner, and then a judgment in a separate

8    proceeding against JANA, that Dreier was authorized to settle,

9    and therefore we're barred in our claim against them.

10          The only way to efficiently resolve that issue, fully

11   and finally, with relief to all parties and with an absolute

12   bar in front of the litigation over it, is for a court of

13   competent jurisdiction to hear the question of whether Paul

14   Gardi is the beneficial owner of the 6.3 million dollars.  And

15   that is what we seek in our motion to lift the stay.  And that

16   is what we would plainly be barred from doing if the GSO

17   settlement is approved.

18          And one other thing.  There's been a lot of talk about

19   channeling.  We're going to channel the money, and you can

20   fight over that pot.  Well, as I understand the channeling

21   proposition, my pot went from sixty-two million dollars of

22   preference claims that are out there, and the 6.3 million of my

23   client's money that is in the hands of the GSO parties.  That

24   was my pot to begin with.  And because the trustee has

25   undertaken to compromise and settle that claim, we say, without

1    authority, as it relates to the 6.3 million, my pot is now 9.25

2    million dollars.

3            THE COURT:  But you only have a 6.3 million dollar

4    claim.

5            MR. STEPHENSON:  Well, but am I ratably -- am I

6    limited?  Am I limited to 9.25 as a percentage of the 62

7    million that was recovered.  That's less than one-sixth.  And

8    so that I'm from 6.3 down to a million dollars in my claim.  Or

9    if I'm right, do I get the first 6.3 million of the 9.25?  We

10   don't know.  You know why we don't know?  There's no plan.

11   There's no plan.  We don't have any idea -- and as Mr. Clark

12   said and as others have said, this agreement on a standalone

13   basis is a one-off, a shot in the dark.  We don't know how it

14   fits into the broader scheme.

15           And in order to make a truly informed decision about

16   what's equitable and what's right, on all of the facts and the

17   circumstances, the Court needs all the evidence.  The Court

18   needs to sift through the interests of all the parties.  And

19   the Court needs to understand how one thing affects another.

20           THE COURT:  What more evidence or what factual

21   disputes are there that I would have to resolve in order to

22   know whether I could approve this settlement or not approve it?

23           MR. STEPHENSON:  Well, respectfully, I think Your

24   Honor has to decide the question of whether my client is the

25   beneficial owner of the 6.3 million dollars and whether the

1   trustee is even authorized to compromise and settle that claim.

2   And the Court would need to consider, before it entered a bar

3   order as broad as the one presently proposed, whether under all

4   the facts and the circumstances, that is an appropriate --

5   whether these are the unusual circumstance contemplated by

6   Metromedia where it is both essential to get the settlement

7   done, that is GSO is requiring --

8           THE COURT:  But GSO says it will not do the deal

9   without that provision --

10          MR. STEPHENSON:  Fine.

11          THE COURT:  -- so do I need any more facts to decide

12  that particular issue?

13          MR. STEPHENSON:  Well, if they won't settle, then the

14  motion, I assume, would be withdrawn if Your Honor said I am

15  not approving --

16          THE COURT:  Okay.  But on the issue of whether or not

17  it's critical to the settlement, do I need to take any evidence

18  on that?

19          MR. STEPHENSON:  If they say that it is, then we can

20  only assume that that's what they'd say under oath if cross

21  examined.  And so maybe it is.  The problem though, and

22  everyone here acknowledges it, we are having a one-off

23  settlement without any context or understanding of a broader

24  plan, that is compromising, I submit, on meager terms, but you

25  know, we could quarrel about that -- is compromising what

1    everyone says is the largest single claim of this estate,

2    sixty-two million dollars.  And if I understood the movants,

3    sixty-three million dollars out of ninety-million that's out

4    there.  I think they said there was another thirty million

5    dollars in preference claims.

6         Why on earth would we decide right out of the gate to

7    settle the largest claim of the estate so that we can pursue

8    the smaller claims of the estate?  If the strategy is let's

9    pursue preference actions to maximize recovery for the estate,

10   why doesn't it apply to the first sixty-two million?  Why do we

11   settle the biggest claims to fund going after the smaller

12   claims?  If I were a reasonable and logical man --

13        THE COURT:  Well, maybe GSO was the first to come up

14   to the plate?

15        MR. STEPHENSON:  Boy that -- they are getting one heck

16   of a first-mover discount.  And maybe some of that is

17   important, but I will tell you, that I represent clients in a

18   lot of contexts, Judge, with multiple defendants.  And it is

19   usually my strategy, being economically rational, to settle

20   with the smallest claims to fund my litigation against the

21   bigger claims.  Because if I've got to win the same legal

22   issue, I want to win it against the sixty-two million.  I don't

23   want to win it against five people or ten people or twenty

24   people, who in the aggregate hold thirty million.  The

25   economically reasonable, rational person wouldn't take that

1    strategy.

2          So I don't know, because I'm not privy to these

3    discussions.  But I understand from what's been filed and

4    what's been argued here today that the defenses on GSO are

5    common to the other parties.  I also heard, and I know Your

6    Honor did too, that there were lots of red flags.  I will tell

7    you, as someone who represents a party against whom no

8    preference or avoidance actions could be brought, because we

9    received no money, because we were not a party to the Ponzi

10   scheme, unlike all of these other claimants, I'm very

11   interested in how red those flags were.  I'm very interested in

12   what it implies about actual notes or inquiry notes.  I'm very

13   interested in how we might develop the facts that creates a

14   risk, just a qualm of risk.

15         THE COURT:  So why didn't you take any discovery?

16         MR. STEPHENSON:  Well, we got -- we got this motion

17   on -- we got the proposed settlement on January the 8th.  And

18   this hearing is set at or about that time for February the 2nd.

19   We had those thirty days.  We have to file all the motions that

20   we need here before Your Honor --

21         THE COURT:  You could have sought an adjournment.  You

22   could have sought to take expedited discovery.

23         MR. STEPHENSON:  Fair enough.  Fair enough.  I could

24   have.  That's something I could have done.  I thought that that

25   would not be very moving on Your Honor unless you heard the

1   arguments that we are making that we presented in our papers,

2   and that I was able to speak to you about why considering those

3   options makes sense.

4       And you asked me, fundamentally, what do we want to

5   know about the settlement in order to approve it, and what I am

6   saying fundamentally is, we have no idea how it fits into a

7   broader plan.  And the only stated strategy is:  I was afraid

8   of the risk of litigating with the holder of at least sixty-two

9   million, and I know I had evidence -- I had evidence that I

10  might be able to go after the whole of the money.  And again, I

11  will tell you, from representing clients in similar

12  circumstances, where you can create in an entity like the GSO

13  affiliates, some qualm of risk, then they have 196 million

14  dollars at issue, or 165 million dollars at issue, and there is

15  at least the possibility that it survives summary judgment, and

16  now I am a great big hedge fund as a defendant in a court in

17  this environment, I might put some money on that risk.  I

18  might.

19      THE COURT:  Okay.  Why don't you wrap it up.

20      MR. STEPHENSON:  At the end of the day, Judge, all we

21  want, simply, is for a court of competent jurisdiction to

22  consider the evidence and to reach a legal conclusion about

23  whether we are the beneficial owner of the 6.3 million dollars,

24  and if we are, permit us to trace it for the reasons that are

25  set out in our papers and that our chart demonstrates, because

1    it is plainly traceable.  And under the law and Your Honor's

2    decision in Schick -- and I appreciated in Schick II, as I

3    referred to it, where you observed in footnote 9 that a party

4    exactly in the Gardi parties' circumstance, not the bank who's

5    seeking to use as a shield the fact that the trustee lacks

6    standing, you're absolutely right, that's an inappropriate use

7    of that argument.

8         But in your footnote 9, you recognized, as we do, that

9    where you're the beneficial owner, you absolutely have a right

10   to go after the third party.  Don't bar that claim from us,

11   Judge.  Please let us present our facts and let us make the

12   legal argument, so that a court of competent jurisdiction can

13   adjudicate the issue of who is the holder of the 6.3 million

14   dollars.  And then let us recover it.  It's right, it's

15   equitable.  And we respectfully submit, it's the thing that

16   this Court should do to address my client's interest, both

17   under the motion to lift stay and with respect to our

18   objections to the GSO settlement.

19        THE COURT:  Okay.  Thank you.

20        Anybody else who wants to be heard?

21        MR. SHORE:  Your Honor, Chris Shore from White & Case

22   for the GSO party.

23        I'd like to clarify first the arrangement we made with

24   the creditors' committee.  The creditors' committee was the

25   only party who sought any discovery from us.  They sought it

1   informally, and we shared documents that we've shared with the

2   U.S. Attorney's Office, in their determination -- that they

3   used in determining that we were also a victim of fraud.

4         The deal that is arranged is if the approval order is

5   entered as it was submitted, today, and it goes final, GSO will

6   remove or withdraw its replacement claim as set forth in

7   paragraph 6 of the agreement.  The point though is that it ends

8   today.  GSO is not willing to be incrementalized over time.  So

9   as long as it all goes final, the 502(h) claim is out.

10        Other than that, obviously, GSO has a lot of thinking

11  on this issue, has explanations for a lot of this.  But we

12  recognize that our point of view in this process is probably

13  the least relevant to the Court as far as determining the

14  reasonableness of the settlement.

15        So I'm happy to answer any questions you have, but.

16        THE COURT:  Yes.  I just have a question about the

17  proposed bar, which is in the settlement agreement.  It

18  basically says that the bar will enjoin any and all creditors,

19  parties-in-interest and any person or entity that files a proof

20  of claim.  Does a creditor and a party-in-interest also have to

21  file a proof of claim to be barred?

22        MR. SHORE:  No, they would be a party who would meet

23  the definition of a creditor under Section --

24        THE COURT:  So whether or not they file a proof of

25  claim they're barred.  Okay.

1          MR. SHORE:  If they are, in fact, in a creditor

2    relationship with Dreier LLP or Mr. Dreier, their claims for

3    the loss are going to be channeled through this process and

4    through the bankruptcy case.

5          THE COURT:  Okay.  Thank you.  Here's what I propose

6    to do.  Is there anybody who wants to -- not necessarily this

7    second -- but wants to examine the trustee under oath?  I would

8    accept her statement or affidavit or declaration that I

9    received yesterday as her direct testimony.  Is there anybody

10   who wants an opportunity to cross examine the trustee?

11         Hearing no response, I'll reserve decision.  Thank you

12   very much.

13         (Proceedings concluded at 11:40 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4     I, Penina Wolicki, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     _____

8     Penina Wolicki

9

10    Veritext

11    200 Old Country Road

12    Suite 580

13    Mineola, NY 11501

14

15    Date:  February 4, 2010

16

17

18

19

20

21

22

23

24

25