UNITED STATES BANKRUPTCY COURT             **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                          :
                                                :     Chapter 11
        DREIER LLP,                             :     Case No. 08-15051 (SMB)
                                                :
                        Debtor.                 :
------------------------------------------------------------X
In re:                                          :
                                                :     Chapter 7
        MARC S. DREIER,                         :     Case No. 09-10371 (SMB)
                                                :
                        Debtor.                 :
------------------------------------------------------------X

## MEMORANDUM DECISION DENYING
## MOTIONS TO APPROVE SETTLEMENTS
## AND LIFT THE AUTOMATIC STAY

**A P P E A R A N C E S :**

DIAMOND MCCARTHY LLP
Attorneys for Sheila M. Gowan, Chapter 11 Trustee
  of the Estate of Dreier LLP
620 Eighth Avenue, 39th Floor
New York, New York 10018

        Howard D. Ressler, Esq.
        Stephen T. Loden, Esq.
        Amos Elberg, Esq.
                Of Counsel


KLESTADT & WINTERS LLP
Attorneys for the Official Committee
  of Unsecured Creditors
545 Fifth Avenue, Suite 960
New York, New York 10017

        Tracy L. Klestadt, Esq.
        Sean C. Southard, Esq.
        Brendan M. Scott, Esq.
        Joseph C. Corneau, Esq.
                Of Counsel

UNITED STATES OF AMERICA
United States Attorney for the
  Southern District of New York
86 Chambers Street
New York, New York 10007

       Matthew L. Schwartz
       Assistant United States Attorney
          Of Counsel


WHITE & CASE LLP
Attorneys for GSO Capital Partners, LP
1155 Avenue of the Americas
New York, New York 10036

       J. Christopher Shore, Esq.
       Julia M. Winters, Esq.
          Of Counsel


LAMONICA HERBST & MANISCALCO LLP
Attorneys for Salvatore LaMonica, Chapter 7
  Trustee of the Estate of Marc S. Dreier
3505 Jerusalem Avenue
Wantagh, New York 11793

       Gary F. Herbst, Esq.
       Holly R. Holecek, Esq.
          Of Counsel


ALSTON & BIRD LLP
Attorneys for Paul Gardi and Alex Interactive
  Media, LLC
90 Park Avenue
New York, New York 10016

       Craig Carpenito, Esq.
       Alexander S. Lorenzo, Esq.

One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309

       John E. Stephenson, Jr., Esq.
          Of Counsel

SULLIVAN & CROMWELL LLP
Attorneys for Eton Park CLO Management 1, Eton
  Park CLO Management 2, Eton Park Fund,
  L.P., and Eton Park Master Fund, Ltd.
125 Broad Street
New York, New York 10004

      Bruce E. Clark, Esq.
      William L. Farris, Esq.
      Maureen A. Fitzgerald, Esq.
          Of Counsel

COHEN & GRESSER LLP
Attorneys for Fortress Investment Group LLC,
  FCOF UL Investments, Fortress Credit
  Opportunities I LP, Fortress Credit Corp.,
  Concordia MAC29 Ltd., Concordia Partners L.P.,
  Enterprise Fund Limited, and Concordia
  Institutional Multi-Strategy Fund, Ltd.
100 Park Avenue
New York, New York, 10017

      Mark S. Cohen, Esq.
      Brett D. Jaffe, Esq.
      Daniel H. Tabak, Esq.
      Donald M. Badaczewski, Esq.
          Of Counsel

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Attorneys for Perella Weinberg Partners
  Xerion Master Fund Ltd.
1633 Broadway
New York, New York 10019

      Eric Corngold, Esq.
      Eamonn O'Hagan, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Sheila M. Gowan, the Chapter 11 Trustee of the Estate of Dreier LLP ("Gowan"), and

Salvatore LaMonica, the Chapter 7 Trustee of the Estate of Marc S. Dreier ("LaMonica," and

with Gowan, the "Trustees"), move for the approval of two related settlement agreements. The

first, among the Trustees and the GSO Parties ("GSO"), resolves the Trustees' claims against

GSO, and permanently enjoins a category of third-party claims against GSO.  (Settlement

Agreement, dated Dec. 22, 2009 ("GSO Settlement Agreement").[1]  The second, between Gowan

and the United States of America (the "Government"), settles certain disputes arising in

connection with property that may be or is subject to the Government's forfeiture power.

(Coordination Agreement, dated Dec. 18, 2009[2] (and with the GSO Settlement Agreement, the

"Settlements").)  Several hedge funds (the "Funds"),[3] as well as Paul Gardi and Alex Interactive

Media, LLC (collectively, "Gardi"), filed objections to the GSO Settlement Agreement, and

Gardi also filed a related motion for relief from the automatic stay.  (See Paul Gardi and Alex

Interactive Media, LLC's Motion For an Order Granting Relief from the Automatic Stay, dated

January 15, 2010 (the "Lift Stay Motion") (ECF Doc. # 345).)

For the reasons that follow, the Court concludes that the Settlements are reasonable, but

the permanent injunction required by the GSO Settlement Agreement exceeds the Court's subject

matter jurisdiction, and must be modified.  In addition, the Lift Stay Motion is denied.

---

[1]    The GSO Settlement Agreement is attached as Exhibit A to the Trustee's Motion Pursuant to Section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Agreements, dated Jan. 8, 2010 (the "Settlement Motion") (ECF Doc. # 337).  The GSO Parties include GSO Capital Partners LP, its affiliates and all entities controlled or managed by GSO or one of its affiliates.  (GSO Settlement Agreement at 1.)

[2]    The Coordination Agreement is attached as Exhibit B to the Settlement Motion.

[3]    Eton Park CLO Management 1, Eton Park CLO Management 2, Eton Park Fund, L.P., Eton Park Master Fund, Ltd. (collectively, "Eton Park"); Fortress Investment Group LLC, FCOF UL Investments, Fortress Credit Opportunities I LP, Fortress Credit Corp., (collectively, "Fortress"); and Concordia MAC29 Ltd., Concordia Partners L.P., Enterprise Fund Limited, and Concordia Institutional Multi-Strategy Fund, Ltd. (collectively, "Concordia") filed a joint objection.  Perella Weinberg Partners Xerion Master Fund Ltd. ("Perella") objected separately.

# BACKGROUND

## A.    Introduction

### 1.    The Scheme

Prior to his arrest in December 2008, Marc S. Dreier, a New York lawyer, was the sole equity partner of Dreier LLP ("LLP"), a New York City-based law firm that employed approximately 300 people.  (Report of the Receiver and Request for Dissolution of Receivership, dated February 17, 2009 ("Receiver Report"), at 1.)[4]  In addition to practicing law, Dreier ran a Ponzi scheme between 2004 and 2008.  He sold bogus promissory notes ("Notes"), and received approximately $700 million in fraud proceeds over the course of the scheme.  (See id. at 8–12.) He deposited virtually all of the proceeds into a specific LLP attorney trust account (the "5966 Account"), (id. at 7), but he also deposited client funds into the same account.  (Id.)  Dreier used the 5966 Account to pay principal, interest and fees to the investors in the Ponzi scheme, to fund his lifestyle and to subsidize LLP's operations.  (Id. at 8.)

Dreier's scheme collapsed shortly after he was arrested in Toronto and charged with criminal impersonation.  He was subsequently arrested in New York upon his return from Toronto, (see Letter in Advance of Joint Hearing, filed by Matthew L. Schwartz on April 20, 2009, at 2 (ECF Doc. # 216)), and ultimately charged in a superseding indictment with conspiracy, securities fraud, wire fraud, and money laundering.  (Indictment, filed Mar. 17, 2009 (ECF Doc. # 39 in United States v. Dreier, No. 09-cr-85 (JSR) (S.D.N.Y. Mar. 17, 2009)).) Dreier pleaded guilty to all counts on May 11, 2009, (see Statement of the United States of America in Support of Trustee's Motion Pursuant to Section 105(a) of the Bankruptcy Code and

---

[4]    The Receiver Report is attached as Exhibit A to the Declaration of Maureen A. Fitzgerald, filed Jan. 27, 2010 (ECF Doc. # 367).

Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Agreements, dated

Feb. 1, 2010, at ¶ 3 (ECF Doc. # 373)), and was sentenced to 20 years in prison by District Judge

Jed Rakoff on July 13, 2009.  (Judgment in a Criminal Case, dated July 15, 2009 ("Judgment"),

at 3 (ECF Doc. # 84 in United States v. Dreier, No. 09-cr-85).)

The original and superseding indictments also included broad forfeiture allegations.

Following Dreier's guilty plea, Judge Rakoff signed an Order of Forfeiture/Preliminary Order of

Forfeiture as to Specific Properties ("Preliminary Forfeiture Order") (ECF Doc. # 85 in United

States v. Dreier, No. 09-cr-85) that ordered Dreier to forfeit

> any and all property, real and personal/that constitutes or is derived from proceeds
> traceable to the commission of the fraud offenses alleged in Counts One through
> Seven, and any and all property, real and personal, involved in the money
> laundering offense alleged in Count Eight, and all property traceable to such
> property.

(Id. ¶ 2, at 4.)  The Preliminary Forfeiture Order specifically included "[a]ny and all funds in [the

5966 Account] held at JP Morgan Chase in the name of Dreier LLP."  (Id., Sched. A at i (Item

13).)  Hence, it also included all property traceable to the 5966 Account.

In addition, the Judgment ordered restitution in the sum of $387,675,303, (Judgment at

7), and attached a list of Dreier's victims—the beneficiaries of the ordered restitution.  Judge

Rakoff subsequently signed amended restitution orders that listed the aggregate amount of

restitution and the amount that each victim lost, and directed payment of restitution on a pro rata

basis.  (ECF Doc. #s 88 (Amended Restitution Order, dated Aug. 18, 2009); 93 (Second

Amended Restitution Order, dated Sept. 29, 2009) in United States v. Dreier, No. 09-cr-85.)

Gardi and the Funds (or their affiliates) are beneficiaries under the restitution orders.

2.      **The Bankruptcy Cases**

On December 8, 2008, the Securities and Exchange Commission (the "SEC") filed a civil

complaint alleging that Dreier had violated the federal securities law through the sale of the

Notes.  (Receiver Report at 2.)  Two days later, District Judge Miriam G. Cedarbaum appointed

Mark F. Pomerantz (the "Receiver") as receiver and temporarily restrained the assets of Dreier

and LLP.  (Id. at 3.)  On December 16, 2008, the Receiver commenced a voluntary chapter 11

proceeding on behalf of LLP, (Settlement Motion at ¶ 3), and the United States Trustee thereafter

appointed Gowan chapter 11 trustee of LLP's estate.  (Order Granting Application for

Appointment of Chapter 11 Trustee, signed Jan. 9, 2009 (ECF Doc. # 39).)

On January 26, 2009, several of Dreier's creditors, including Gowan, filed an involuntary

chapter 7 petition against Dreier.  (Motion of Chapter 7 Trustee to Approve Stipulation Between

Chapter 7 Trustee, Sheila M. Gowan, Solely in Her Capacity as the Chapter 11 Trustee for

Dreier LLP and GSO Capital Partners LP on Behalf of Itself and the GSO Parties, dated Jan. 8,

2010 (the "LaMonica Motion"), at ¶ 2 (ECF Doc. # 121 in Case No. 09-10371).)  Relief was

ordered on February 27, 2009, and the United States Trustee appointed LaMonica to serve as the

interim chapter 7 trustee.  (Notice of Appointment of Trustee, filed Mar. 2, 2009 (ECF Doc. # 11

in Case No. 09-10371).)  LaMonica subsequently became permanent trustee by operation of law.

See 11 U.S.C. § 702(d).

B.      **The Settlements**

As discussed in greater detail below, the Government's right to forfeit the debtors' assets

conflicted with the Trustees' rights to recover property of their respective estates, although there

was a significant overlap in the identities of the ultimate beneficiaries.  On April 22, 2009, Judge

Rakoff, Judge Cedarbaum and I conducted a joint hearing urging a global resolution of

outstanding bankruptcy and forfeiture issues.  After lengthy negotiations, the Government, the

Trustees and other affected parties reached a global settlement contained in three separate

agreements.

### 1.      The Agreements Involving GSO

### a.      The Consent Order of Forfeiture

GSO was an investment manager for certain purchasers of the Notes.  (Settlement Motion

at ¶ 8.)  It had been induced to transfer $165 million to LLP accounts in the course of the

scheme.  (Id.)  During the same period, GSO received full repayment of principal amount of the

Notes it had purchased, (id., Ex. A at 3), and roughly $30.9 million in additional purported

interest and fees, (id., Ex. A at 4), including approximately $62.6 million from the 5966 Account

within 90 days of the LLP petition date.  (Id. at ¶ 8.)  GSO deposited over $35.4 million from

those transfers directly into identifiable sub-accounts belonging to GSO affiliates.[5]  (Id.)

GSO faced substantial potential forfeiture liability.  On March 13, 2009, the Government

filed the Government's Forfeiture Bill of Particulars, giving notice that the forfeiture allegations

in the superseding indictment included certain accounts maintained by or for the benefit of GSO.

That same day, District Judge Rakoff issued a Post-Indictment Restraining Order (ECF Doc. #

66 in United States v. Dreier, No. 09-cr-85), freezing over $35 million in accounts (the "Frozen

Funds") held by Bank of America for the benefit of GSO.[6]  Finally, although the Preliminary

Forfeiture Order did not mention the Frozen Funds, which were traceable to the 5966 Account,

---

[5]      GSO entity Foxe Basin CLO 2003, Ltd. received $2,222,000 from the 5966 Account.  GSO entity GSO
Offshore Multicurrency Facility received $33,187,990.61 from the 5966 Account.  (GSO Settlement Agreement at
4.)

[6]      The District Court had issued several earlier restraining orders following Dreier's arrest.

the Government subsequently stated its intention to amend the Preliminary Forfeiture Order to

add the Frozen Funds expressly.  (Settlement Motion at ¶ 9.)

The Government and GSO resolved the Government's potential claims through the

Consent Order of Forfeiture, filed Dec. 23, 2009.  (Government's Memorandum in Support of

Application for Consent Order of Forfeiture, filed Dec. 23, 2009, Ex. C (ECF Doc. # 96 in

United States v. Dreier, No. 09-cr-85).)  The Consent Order of Forfeiture provided that GSO

would disgorge $30,895,078.88—the amount of profits and fees it received during the Ponzi

scheme.  In exchange, the Government would not seek additional forfeiture of any other funds

that GSO had received.  (Id. ¶ 5, at 7.)  The Consent Order of Forfeiture did not depend on the

approval of the other agreements discussed in this opinion.

### b.    The GSO Settlement Agreement

GSO also faced substantial potential liability to the LLP estate under the avoidance

provisions of the Bankruptcy Code.  After subtracting the forfeited funds, GSO had still received

over $30 million from LLP during the preference period.  Furthermore, as payments made to the

investor in a Ponzi scheme, all of the transfers to GSO were presumptively fraudulent.  See Bear,

Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 13 (S.D.N.Y. 2007);

Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons,

Inc.), Adv. Proc. No. 07-2780, 2009 WL 3806683, at *13 n.19 (Bankr. S.D.N.Y. Nov. 10, 2009).

In addition, LaMonica asserted a right to recover at least some of those transfers.

The GSO Settlement Agreement resolved the Trustees' claims.  GSO agreed to pay $9.25

million to Gowan and $250,000 to LaMonica.  (GSO Settlement Agreement ¶ 1, at 5.)  The

Trustees agreed to release GSO from any claims relating to payments it received from the

scheme, (id. ¶ 5, at 7), and GSO agreed to release any claims it could have brought against LLP,

Gowan, or LaMonica.  (Id. ¶ 4, at 7.)

The GSO Settlement Agreement also required the entry of a permanent injunction (the

"Bar Order") in favor of the "GSO Releasees"[7] barring third party claims "relating to Marc

Dreier, Dreier LLP, and the Note Fraud Funds":

> The Bankruptcy Trustees . . . shall obtain a permanent injunction . . . (the "Bar
> Order"), enjoining any and all creditors, parties in interest, and any entity or
> person that files a proof of claim in the Chapter 11 Case and/or the Chapter 7
> Case from commencing or continuing any . . . causes of action . . . and from any
> and all allegations of liability or damages . . . against the [GSO Releasees] . . .
> relating to Marc Dreier, Dreier LLP, and the Note Fraud Funds; and releasing and
> forever discharging all GSO Releasees from any and all Claims and Causes of
> Action known or unknown, that are, have been, could have been or might in the
> future be asserted against any of the GSO Releasees relating to Marc Dreier,
> Dreier LLP, and the Note Fraud Funds.

(Id. ¶ 2, at 5–6.)

### 2.    The Coordination Agreement

The Coordination Agreement between the Government and Gowan was intended to

resolve the disputes regarding the conflicts between the forfeiture and bankruptcy laws.  Gowan

agreed not to challenge the Government's attempt to forfeit the Frozen Funds and any other

assets, including specific artwork, identified in the Preliminary Forfeiture Order.  (Coordination

Agreement ¶¶ 2–3, at 5.)  The Government, in turn, agreed to release certain other artwork (the

"Artwork") that it had seized in Dreier's criminal case to Gowan.[8]  (Id. ¶ 1, at 5.)  Gowan stated

that the some pieces of artwork "were made by well known artists and should result in a

substantial payment after auction," (Declaration of Sheila M. Gowan, Chapter 11 Trustee of

---

[7]    The "GSO Releasees" are defined below.  Unless otherwise stated, references to "GSO" include the "GSO
Releasees" as well as the "GSO Parties."

[8]    The Artwork is listed in Schedule 1 of the Coordination Agreement.

and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Settlements, dated

Feb. 1, 2010 ("Gowan Declaration"), at ¶ 22 (Exhibit A to ECF Doc. # 371)), and estimated that

the Artwork "may have had an approximate aggregate purchase price value of $3 million."

(Settlement Motion at ¶ 23(b).)  Of far greater significance, the Government also agreed to waive

any rights, including any forfeiture rights, to the proceeds of any avoidance actions brought by

Gowan against entities identified in Schedule 2 of the Coordination Agreement.  (Coordination

Agreement ¶ 4, at 5.)  Important to the current motions, the parties' obligations under the

Coordination Agreement were contingent on approval of the GSO Settlement Agreement.  (Id. ¶

15, at 8.)[9]

## C.      The District Court Litigation

The Coordination Agreement required the separate approval of the District Court.  The

Funds objected.  They opposed the turnover of the Artwork, arguing that it should be preserved

for the victims of Dreier's scheme.  For the same reason, they opposed the Government's

agreement to turn over to LaMonica 10% of the net proceeds derived from the sale of Dreier's

Manhattan condominium and two homes in the Hamptons (approximately $827,700).  Finally,

the Funds expressed their concerns about Gowan's perceived litigation strategy.  Worried that

the GSO Settlement Agreement—which was not before the District Court—would create a war

chest for the LLP estate, the Funds argued that it would be unfair to permit Gowan to sue them,

and in any event, they had defenses to the avoidance claims.

---

[9]        Judge Rakoff had approved the Coordination Agreement in the District Court Opinion, but the
effectiveness of the Coordination Agreement is contingent upon this Court's approval of the GSO Settlement
Agreement.  (District Court Opinion at 3; Coordination Agreement ¶ 15, at 8.)

Gardi did not object, but filed a motion to amend the Second Amended Restitution Order. (See ECF Doc. # 102 in United States v. Dreier, No. 09-cr-85.)  LLP had represented Gardi in connection with a dispute with JANA Partners LLC ("JANA").  (Paul Gardi's and Alex Interactive Media, LLC's Objection to the Trustee's Motion Pursuant to Section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Agreements, dated Jan. 27, 2010 ("Gardi Settlement Objection"), at ¶ 15 (ECF Doc. # 364).)  In early October 2008, Gardi learned that JANA had agreed to pay approximately $6.3 million as part of a settlement.  (Id. at ¶ 16.)  Although this amount satisfied the monetary component of the dispute, other unresolved issues still existed.  (Id.)  According to Gardi, Dreier falsely represented to JANA that Gardi was willing to concede his position and settle on JANA's terms, (id. at ¶ 17), while simultaneously telling Gardi that JANA was willing to concede its position and settle on his terms.  (Id. at ¶ 18.)  Dreier thereby fraudulently induced Gardi to sign the settlement agreement in which JANA yielded to his demands, (id. at ¶ 19), and forged Gardi's signature on a different settlement agreement that contained all of JANA's terms.  (Id. at ¶ 21.)

Though the two agreements were materially different, each required JANA to pay $6,349,093, to be delivered at Gardi's direction.  (Id. at ¶ 22.)  Pursuant to Dreier's instructions, JANA wired $6.3 million (the "JANA Funds") into the 5966 Account on October 15, 2008.  (Id. at ¶¶ 23–24.)  Within two days of JANA's wire transfer, Dreier conveyed the JANA Funds from the 5966 Account to a number of third parties, and Gardi never received the settlement proceeds. (Id. at ¶ 26.)

Gardi's motion before the District Court challenged the pro rata distribution procedures under the Second Amended Restitution Order.  Gardi was a beneficiary of the order, but argued that his situation was different from Dreier's defrauded investors.  He was a client of LLP, to

whom Dreier owed fiduciary duties.  Dreier breached those duties, lied to Gardi and stole his

settlement proceeds.  In addition, he was an individual, whereas the defrauded investors were

large institutions that could more easily absorb their losses.  Gardi asked the District Court to

modify the Second Amended Restitution Order to grant him priority in distribution before the

balance of the funds were distributed pro rata to the defrauded investors[10].  (See [Corrected]

Memorandum in Support of Paul Gardi's Motion to Modify the Second Amended Restitution

Order, dated Jan. 14, 2009, at 10–18 (ECF Doc. # 114 in United States v. Dreier, No. 09-cr-85).)

      In a Memorandum Order, dated Feb. 5, 2010 (the "District Court Opinion") (ECF Doc. #

377), Judge Rakoff overruled the Funds' objections, denied Gardi's motion and approved the

Consent Order of Forfeiture and the Coordination Agreement.[11]  As to Gardi, the District Court

concluded that the pro rata distribution scheme was fair and consistent with Second Circuit law

that endorsed this approach "involving a Ponzi scheme or the commingling of similarly situated

victims' assets."  (District Court Opinion at 11) (citing SEC v. Credit Bancorp Inc., 290 F.3d 80,

88–89 (2d Cir. 2002).)  The District Court also rejected Gardi's core argument that his situation

was unique or that he should be treated better than the other the victims of Dreier's fraud:

> It is clear from the responses that Gardi is not the only "client" victim of Dreier's
> frauds or to whom Dreier owed fiduciary duties, and each case doubtless has its
> own nuances.  Additionally, the "note fraud" victims are only immediately the
> Hedge Funds; it is the investors in these funds, including individuals, charitable
> and educational institutions, and many others who are the ultimate "note fraud"
> victims.  The truth is that a fraud as large and egregious as Dreier's is like an
> earthquake that savages its victims at random and is followed by a series of
> aftershocks that destroys still further assets.  Any alternative to the pro rata
> approach would entail a costly and extensive inquiry into the circumstances of

---

[10]      Gardi did not object if the same priority was granted to similarly situated individual victims.

[11]      Judge Rakoff also approved a separate agreement between the Government and LaMonica, mentioned in
the Funds' objection, which allocated 90 percent of proceeds from the sale of Dreier's apartment and Hampton
homes to the Government and the remaining 10 percent to the Dreier chapter 7 estate.  (See District Court Opinion
at 3–4.)

each victim's loss, which would likely devolve into a war of recriminations, to the detriment of all concerned.

(Id. 11–12.)

### D.    The Trustees' Motions to Approve the Settlements

The Trustees moved separately before this Court for the approval of the GSO Settlement Agreement and the Coordination Agreement.  Since the Government's consent to the Coordination Agreement depends on the approval of the GSO Settlement Agreement, they must be viewed as a single settlement among the Trustees, GSO and the Government.  The Trustees argue that the overall settlement is fair, reasonable and in the best interests of the estates based upon the advantages it confers and the certainty it brings to future efforts to avoid and recover transfers to other parties.  (See Gowan Declaration at ¶ 22; LaMonica Motion at ¶¶ 18–20.)

The Funds and Gardi filed objections.  They argue, in the first instance, that the motion to settle with GSO did not provide adequate disclosure to parties in interest.  (Objection of Eton Park, Fortress, and Concordia Funds to Trustee's Motion for Approval of Agreements, dated Jan. 27, 2010 (the "Hedge Funds' Objection"), at ¶¶ 3, 27–29 (ECF Doc. # 366).)  In addition, the settlement gives up a fairly straightforward $62.5 million preference claim for only $9.5 million.  (Gardi Settlement Objection at ¶¶ 2, 44–51.)  Furthermore, the settlements unfairly permit GSO to keep 94% of the money returned by Dreier or LLP while the Funds suffered disproportionately larger losses.[12]  (Hedge Funds' Objection at ¶¶ 4, 28.)

---

[12]    The Funds (a subset of Dreier's Note investors) have asserted over $234 million of the approximately $569.4 million in claims in LLP's chapter 11 case.  (See Hedge Funds' Objection at ¶ 9.)  Perella submitted an unliquidated claim that nominally claimed $0.00 but reflected $45 million in losses.  (Claim # 289 in Case No. 08-15051; Claim # 32-1 in Case No. 09-10371.)

They direct their strongest opposition, however, to the proposed Bar Order. The Funds contend that the Court lacks subject matter jurisdiction to approve the Bar Order, (Limited Objection of Perella Weinberg Partners Xerion Master Fund Ltd. to Trustee's Motion Pursuant to Section 105(a) of The Bankruptcy Code and Rule 9019 of The Federal Rules of Bankruptcy Procedure for Approval of Agreements, dated Jan. 27, 2010 (the "Perella Objection"), at ¶¶ 9–13 (ECF Doc. # 363)), and moreover, the Bar Order is overly broad and inconsistent with Second Circuit precedent. (Hedge Funds' Objection at ¶¶ 2, 19–26; Perella Objection, at ¶¶ 14–19.) They also claim that the GSO Settlement Agreement is inequitable because GSO and the Funds are similarly situated, and as such, the Bar Order should offer the same protection to the Funds that it gives to GSO. (Hedge Funds' Objection at ¶¶ 4, 38.)

Gardi raises similar objections to the Bar Order, and one specific to him. He argues that as a Dreier client — rather than a Dreier investor — he is "uniquely situated" and does not fall into the general category of Ponzi scheme victims. (Gardi Settlement Objection at ¶¶ 28, 35–36.) He also contends that he can trace at least some of the JANA settlement proceeds first deposited in the 5966 Account and then transferred to GSO. (See id. at ¶ 26.) The Bar Order improperly cuts off his right to pursue those funds. (See id. at ¶¶ 37–43.)

### E.    The Lift Stay Motion

Gardi also filed the Lift Stay Motion to trace the JANA Funds into the hands of the transferees. Echoing the Gardi Settlement Objection, Gardi argues that the JANA Funds were acquired by theft, and therefore, never became property of LLP or the LLP estate. (See Lift Stay Motion at ¶¶ 20–26.) The automatic stay does not apply to such property, (see id. at ¶¶ 32–33), and the JANA Funds can be traced. (See id. at ¶¶ 27–31.) At the hearing held on February 2, 2010, Gardi also argued that stay relief was necessary because JANA was not a party to the

bankruptcy case, and the Court did not, therefore, have subject matter jurisdiction over his potential dispute with JANA regarding the ownership of the settlement funds.  (See Transcript of hearing, held Feb. 2, 2010, at 51–54 ("Tr. (2/2/10)") (ECF Doc. # 376).)

Several parties oppose the Lift Stay Motion.  Fortress argues that it is procedurally flawed; the issue of whether certain property belongs to the estate must be settled in an adversary proceeding—not in a motion for relief from the automatic stay.  (Objection of Fortress Investment Group LLC to Motion of Paul Gardi and Alex Interactive Media, LLC for an Order Granting Relief from the Automatic Stay, dated January 26, 2010, at ¶¶ 2, 10–11 (ECF Doc. # 355).)  Furthermore, the issue of estate property permeates all aspects of the case, and belongs before this Court.  (See id. at ¶¶ 12–13.)

Gowan and the LLP Official Committee of Unsecured Creditors (the "Committee") also oppose the Lift Stay Motion.  They argue that Gardi has not demonstrated an interest in the JANA Funds sufficient to establish standing to lift the automatic stay.  (Trustee's Objection to Paul Gardi and Alex Interactive Media, LLC's Motion for an Order Granting Relief from the Automatic Stay, dated Jan. 26, 2010, at ¶ 9 (ECF Doc. # 359); Objection of the Official Committee of Unsecured Creditors to Paul Gardi and Alex Interactive Media, LLC's Motion for an Order Granting Relief from the Automatic Stay, dated January 26, 2010 (the "Committee Lift Stay Objection"), at ¶¶ 18–19 (ECF Doc. # 356).)  Additionally, the Committee asserts that the Gardi and the Funds are similarly situated because both lost money as part of Dreier's overall Ponzi scheme.  (See Committee Lift Stay Objection at ¶¶ 20–23.)

## DISCUSSION

### A.    Introduction

On a motion to approve a settlement, a bankruptcy court does not decide underlying questions of law or fact.  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir.), cert. denied, 464 U.S. 822 (1983).  Instead, the court must determine that the settlement does not fall "below the lowest point in the range of reasonableness."  W.T. Grant Co., 699 F.2d at 608 (internal quotation marks and citation omitted).  The decision is based on several factors including the risks and rewards of continued litigation, the possibility of delay, increased costs and difficulty in collection even if the trustee prevails, the interest of the creditors and whether they support the settlement, the competency of counsel that support the settlement and the extent to which the settlement reflects an arms-length bargain.  See In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007).

As the dispute between the parties centers on the interplay between the forfeiture and bankruptcy laws, it is worthwhile to review how they conflict.  The preference and fraudulent transfer provisions of the Bankruptcy Code are intended to allow a trustee to recover property that would otherwise have been available to the estate and its creditors.  See Bear, Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 195 (S.D.N.Y. 2002) ("As we noted above, the purpose of § 548(a)(1)(A) is to prevent the debtor from 'placing assets beyond the reach of creditors' by removing them from the estate with the intent to hinder, delay, or defraud his creditors."); Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.), 318 B.R. 276, 282 (Bankr. S.D.N.Y. 2004) ("A trustee can only avoid and recover 'property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.'") (quoting Begier v. Internal Revenue Service, 496 U.S. 53, 58 (1990)).  State law or other

applicable non-bankruptcy law normally determines the extent of the debtor's interest in property,

absent an overriding federal policy.  Butner v. United States, 440 U.S. 48, 55 (1979); Morton v.

Nat'l Bank of New York City (In re Morton), 866 F.2d 561, 563 (2d Cir. 1989); Bear, Stearns Sec.

Corp. v. Gredd, 275 B.R. at 198 n.13.  Bankruptcy law, on the other hand, determines whether that

interest is "property of the estate."  In re Prudential Lines, Inc., 928 F.2d 565, 569 (2d Cir.), cert.

denied, 502 U.S. 821 (1991); Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re

Crysen/Montenay Energy Co.), 902 F.2d 1098, 1101 (2d Cir. 1990); Winick & Rich, P.C. v. Strada

Design Assocs. (In re Strada Design Assocs.), 326 B.R. 229, 235 (Bankr. S.D.N.Y. 2005).  If the

transfer did not involve property of the debtor under non-bankruptcy law, the trustee cannot avoid

and recover the transfer or its value.  See, e.g., Mortgage Lenders Network v. Sensenich (In re

Potter), 313 F.3d 93, 94 (2d Cir. 2002) (trustee cannot avoid transfer of foreclosed real property).

Federal criminal law authorizes the forfeiture of all property involved in or derived from the

proceeds of certain underlying crimes.[13]  See United States v. McHan, 101 F.3d 1027, 1042 (4th

Cir. 1996).  Although the Government may only forfeit property to the extent of the defendant's

interest in that property, e.g., Pacheco v. Serendensky, 393 F.3d 348, 355 (2d Cir. 2004); United

States v. Peters, 777 F.2d 1294, 1296 (7th Cir. 1985), the forfeiture judgment may exceed the

defendant's available assets.  See e.g., United States v. Day, 524 F.3d 1361, 1377–78 (D.C. Cir.

2008); see United States v. Vampire Nation, 451 F.3d 189, 201–02 (3d Cir. 2006) (forfeiture

judgment may be entered for the full amount of criminal proceeds); United States v. Casey, 444

F.3d 1071, 1077 (9th Cir. 2006) ("Mandatory forfeiture is concerned not with how much an

---

[13]    The forfeiture statute pertaining to securities fraud and wire fraud, 18 U.S.C. § 981(a)(1)(C), is a civil
forfeiture provision.  However, 28 U.S.C. § 2461 mandates criminal forfeiture under 21 U.S.C. § 853 where federal
law provides for civil forfeiture but there is no parallel criminal forfeiture provision.  The criminal forfeiture
provisions in 21 U.S.C. § 853 also apply to money laundering offenses.

individual has but with how much he received in connection with the commission of the

crime.").  If the value of forfeitable property cannot be recovered, the court may order the forfeiture

of "substitute assets," i.e., any other property of the defendant up to the value of the criminal

proceeds.  21 U.S.C. §853(p)(2); United States v. Parrett, 530 F.3d 422, 430 (6th Cir. 2008);

United States v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005).

Under the relation-back doctrine, title to forfeited property automatically vests in the

Government at the time of the defendant's criminal act.  United States v. A Parcel of Land, 507

U.S. 111, 128–29 (1993); Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 627

(1989); United States v. Timley, 507 F.3d 1125, 1130 (8th Cir. 2007).  "The proceeds of an

offense do not exist before the offense is committed, and when they come into existence, the

government's interest under the relation-back doctrine immediately vests."  Timley, 507 F.3d at

1130 (citing United States v. Hooper, 229 F.3d 818, 821–22 (9th Cir. 2000)); see also United

States v. United States Currency in the Amount of $228,536.00, 895 F.2d 908, 916 (2d Cir.

1990) (defendant has no interest in forfeited property at time crime is committed).  Thus, the

Government acquires title to the forfeited assets upon the commission of the underlying crime.

The circuits are split, however, as to whether the relation-back doctrine applies to substitute

assets.  Compare Parrett, 530 F.3d at 431 (forfeiture statute does not provide authorization for

federal prosecutors to restrain substitute assets prior to entry of the order of forfeiture by the

district court) and United States v. Jarvis, 499 F.3d 1196, 1204 (10th Cir. 2007) ("forfeiture of

substitute property cannot occur until after the defendant's conviction and a determination by the

trial court that the defendant's act or omission resulted in the court's inability to reach

[forfeitable] assets") with United States v. McHan, 345 F.3d 262, 272 (4th Cir. 2003) (forfeiture

of substitute property relates back to the date of the acts giving rise to the forfeiture).

**B.    The Reasonableness of the Settlement**

No one has objected in this Court to the Coordination Agreement or to the payment of

$250,000 to LaMonica.  Rather, the proponents and objecting parties have focused their attention

on the overall reasonableness of the GSO Settlement Agreement.  Nevertheless, the Settlements

involve two interdependent agreements, and the reasonableness of the GSO Settlement

Agreement cannot be viewed in isolation from the Coordination Agreement.

The Gowan Declaration detailed the lengthy and sometimes acrimonious negotiations

among the parties that culminated in the Settlements.[14]  The Settlements reflect the product of

arms-length bargaining, and no one has challenged the competency of the lawyers that

represented the parties and support the Settlements.  Furthermore, although the Funds and Gardi

oppose the Settlements, the LLP Committee, which represents the entire creditor constituency,

supports them, and no other creditor has objected.

Turning to the risks[15] and rewards, the principal economic features require Gowan to

give up a potentially substantial avoidance claim against GSO in exchange for a payment of

$9,250,000 plus title to the Artwork that may be worth as much as $3 million.  Gowan's concern

that any preference claim against GSO would be reduced by the amount paid under the Consent

Order of Forfeiture is justified.  (Gowan Declaration at ¶ 19.)  The forfeiture payment relates to

funds that LLP transferred to GSO from the 5966 Account within 90 days of the LLP petition

date.  Under the relation-back doctrine, the forfeited funds never became LLP's property, and

---

[14]    At the February 2, 2010 hearing, the Court stated that it would accept the Gowan Declaration as Gowan's direct testimony, and asked whether anyone wanted to cross-examine her.  No one took up the offer.  (Tr. (2/2/10) at 61.)

[15]    I have discounted any risk that the Trustees would be unable to collect a judgment obtained against GSO.

hence, the payment of the forfeited funds by LLP to GSO did not involve a transfer of LLP's property that would be subject to avoidance.

In addition, Gowan's concerns regarding the strength of the preference and fraudulent transfer claims are reasonable. The preference claim faces "significant uncertainty and risk on how [the property of the estate and antecedent debt] defenses would ultimately be resolved." (Id.) For example, Gardi contends that the JANA funds transferred to GSO never became LLP's property, and Gowan expressed a concern that if GSO prevailed on a similar defense, it could adversely affect all of her avoidance claims. (Tr. (2/2/10) at 8.) Furthermore, although the transfers to GSO were presumptively fraudulent, GSO has disgorged its profits through the forfeiture. It could argue that it gave value for whatever else it received, (Gowan Declaration at ¶ 18), and Gowan found no basis to infer that GSO was on inquiry notice of Dreier's fraudulent scheme.[16] (Id. at ¶ 9.) As a result, she viewed the likelihood of her success as "slim." (Id. at ¶ 19.)

The Coordination Agreement, which is tied to the GSO Settlement Agreement, also provides substantial benefits that are largely ignored by the objecting parties. It will leave Gowan free to pursue through fraudulent transfer litigation an additional $25 million in "profits" paid to investors, (id. at ¶ 22), without interference from the Government or competition with the forfeiture laws. It will also open the way for her to pursue other preference claims with an aggregate face value of $32 million.[17] (Tr. (2/2/10) at 9.) Factoring in the costs and delays of

---

[16]    With certain exceptions, 11 U.S.C. § 548(c) gives a lien to the transferee of a fraudulent transfer who takes in good faith and for value. This section provides a defense to both actual and fraudulent transfers prosecuted under § 548. See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.), 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007). Section 278 of the New York Debtor & Creditor Law provides a similar defense.

[17]    It is not clear whether or to what extent the preference and "profits" claims overlap.

litigation against adversaries with substantial resources, (see Gowan Declaration at ¶¶ 20–21), and the overall benefits to the creditors and the estate, (see id. at ¶¶ 22–23), I conclude that the settlement does not fall below the lowest point in the range of reasonableness.

The foregoing disposes of all but one objection relating to the reasonableness of the Settlements. The Funds and Gardi, a client rather than an investor, are net losers. They complain that GSO will keep 94% of its investment while they suffered disproportionately greater losses. Furthermore, the Funds remain potential defendants in future avoidance litigation.[18] Unfortunately, Dreier's fraud did not spread its harm evenly, and some suffered more than others. That said, every settlement must be judged on its own merits, and a settlement is not unreasonable or inequitable merely because, in the end, the settling party suffers less than other victims.

## C.    The Bar Order

### 1.    The Court's Jurisdiction and Authority

As noted, the greatest challenge is directed at the Bar Order, which releases GSO from any claims by creditors or parties in interest "relating to Marc Dreier, Dreier LLP, and the Note Fraud Funds." The Funds and Gardi argue, in the main, that the Court lacks jurisdiction to enjoin third party actions, and even if jurisdiction exists, the Court lacks the authority to enter the injunction under the facts of the case. Gardi also alleges that the Bar Order will cut off his right to trace his property—the JANA funds—into the hands of GSO.

---

[18]    The Funds received the aggregate amount of $20.5 million from LLP during the 90-day preference period. (Tr. 2/2/10) at 15.)

The resolution of the jurisdictional objection begins—but does not end—with the consideration of MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89 (2d Cir.) ("Manville I"), cert. denied, 488 U.S. 868 (1988). There, the debtor, a manufacturer and distributor of asbestos products, entered into a settlement agreement with its insurers under which the insurers agreed to pay a substantial amount to the estate in exchange for an injunction restraining any lawsuits against the insurers related to the policies involved in the settlement. Id. at 90. The MacArthur Company ("MacArthur"), a distributor of the debtor's asbestos products, objected to the settlement. It asserted a contractual right to coverage under the settled policies pursuant to "vendor endorsements," and argued that the injunction would impair those rights. Id. at 90–91. The bankruptcy court approved the settlement over the objection, the district court affirmed, and MacArthur appealed to the Court of Appeals for the Second Circuit.

On appeal, MacArthur primarily argued that the bankruptcy court lacked the jurisdiction and authority to enjoin lawsuits against the debtor's insurers, and that the injunction granted a de facto discharge to nondebtor parties. Id. at 91. Rejecting this contention, the Court of Appeals stated that the bankruptcy court has jurisdiction over property of the debtor's estate, including its insurance policies, and may enjoin actions which threaten or diminish that property. Id. at 91–92. Although MacArthur asserted separate contractual rights in the insurance policies under the vendor endorsements, its rights were derivative of Johns-Manville's, and sought to collect out of Johns-Manville's insurance policies on the basis of Johns-Manville's conduct. Id. at 92–93. Furthermore, the injunction was appropriate because the insurance settlement/injunction

arrangement was essential to a workable reorganization, and consequently, fell well within the bankruptcy court's equitable powers.[19] Id. at 94.

Several years later, the Second Circuit again addressed the propriety of a third party plan injunction in SEC v. Drexel Burnham Lambert Group, 960 F.2d 285 (2d Cir. 1992). There, the SEC had commenced a suit against Drexel that culminated in an agreement by Drexel to create a $350 million fund. Id. at 288. Drexel paid $200 million, but commenced a chapter 11 case before paying the final $150 million. The SEC filed a $150 million claim, id., negotiations subsequently ensued, and the parties eventually reached a settlement to be effected through a class action.

Under the settlement, Drexel agreed to pay the $150 million balance into a fund created by the SEC (the "SEC Fund"). The SEC Fund would then be divided into subclasses A and B. Subclass A, which consisted of several failed banks administered by the FDIC and RTC, would receive 75% of the SEC Fund. Subclass B, which consisted of claimants that had sued Drexel under the securities laws, would receive 25% of the SEC Fund. Finally, Drexel agreed to pool any recoveries from lawsuits brought against Drexel's former officers and directors with subclass A, and members of subclass B would be enjoined from bringing any future actions against the former officers and directors. Id. at 288–89.

Several claimants objected, inter alia, to the exclusion of subclass B from a share in the pooled recoveries, and to the proposed injunction restraining members of subclass B from suing

---

[19]     The bankruptcy court's jurisdiction to enter the injunction was revisited in Manville II, discussed in the succeeding text.

the officers and directors.  The Court overruled the objection and approved the settlement,

observing

> In bankruptcy cases, a court may enjoin a creditor from suing a third party,
> provided the injunction plays an important part in the debtor's reorganization plan.
> See In re: A.H. Robins Co., 880 F.2d 694, 701 (4th Cir.), cert. denied, 493 U.S.
> 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989).  The Settlement Agreement is
> unquestionably an essential element of Drexel's ultimate reorganization.  In turn,
> the injunction is a key component of the Settlement Agreement.  As the district
> court noted, the injunction limits the number of lawsuits that may be brought
> against Drexel's former directors and officers.  This enables the directors and
> officers to settle these suits without fear that future suits will be filed.  Without the
> injunction, the directors and officers would be less likely to settle.  Thus, we hold
> that the district court did not abuse its discretion in approving the injunction.

Id. at 293; accord Clain v. International Steel Group,156 Fed.Appx. 398, 399–400 (2d Cir. 2005).

Recently, the Second Circuit viewed third party plan releases more skeptically.  In In re

Metromedia Fiber Network, Inc., 416 F.3d 136 (2d Cir. 2005), the bankruptcy court confirmed a

plan under which certain parties (the "Funders") made contributions that included the

forgiveness of unsecured debt, the conversion of debt to equity, a cash investment in the debtor

and the agreement to purchase the debtor's stock.  Id. at 141.  The plan contained a provision that

barred claims against the Funders by holders "of any and all claims, obligations, rights, causes of

action and liabilities arising out of or in connection with any matter related to [Metromedia] or

one or more subsidiaries . . . based in whole or in part upon any act or omission or transaction

taking place on or before the Effective Date."  Id. (ellipsis in original).  The plan also barred

claims against the debtor's current and former personnel "that are related to Metromedia's

bankruptcy and based on acts or omissions taking place on or before the Plan's Effective Date,

unless based upon 'gross negligence or willful misconduct,'" as well as claims relating to the

debtor, the reorganized debtor or the plan.  Id. at 141 n.5.

On appeal from the confirmation order, the Court observed that nondebtor releases are proper only in "rare cases." Id. at 141.  Two considerations justified the Court's reluctance.  First, the only specific authorization for nondebtor releases appears in 11 U.S.C. § 524(g), which deals with asbestos bankruptcies. Id. at 142.  Second,

> a nondebtor release is a device that lends itself to abuse.  By it, a nondebtor can shield itself from liability to third parties.  In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.  The potential for abuse is heightened when releases afford blanket immunity.

Id.  The Court identified several situations in which courts have approved nondebtor releases: where the estate has received a substantial contribution, when the enjoined claims are channeled to the settlement fund, when the enjoined claims indirectly impact the debtor's reorganization, such as claims for contribution or indemnity, and where the affected creditors consent. Id.  Nevertheless, "[n]o case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," id., and "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan, focusing on the considerations discussed above." Id. at 143.  The Court concluded that the bankruptcy court's findings were insufficient, id., but ultimately affirmed the confirmation order, including the nondebtor releases, ruling that the appeal was equitably moot. Id. at 145.

While Manville I specifically addressed the question of the bankruptcy court's jurisdiction, concluding in response to MacArthur's objection that it could enjoin third-party derivative claims asserted against property of the estate, neither Drexel nor Metromedia discussed subject matter jurisdiction.  In fact, the Metromedia Court stated that the only argument it was considering was whether "the nondebtor releases were unauthorized by the

Bankruptcy Code, 11 U.S.C. § 101, et seq., at least on the findings made by the bankruptcy court." Metromedia, 416 F.3d at 141.  The provisions governing the bankruptcy court's subject matter jurisdiction appear in title 28, not title 11.

Subject matter jurisdiction, however, became the primary focus of the Second Circuit in In re Johns-Manville Corp., 517 F.3d 52, 65 (2d Cir. 2008) ("Manville II"), vacated & remanded on other grounds, 129 S. Ct. 2195 (2009), aff'g in part & rev'g in part, No. 06-2103, 2010 WL 1007832 (2d Cir. Mar. 22, 2010) ("Manville III").  As discussed earlier, the Manville plan included a settlement with Manville's insurers, and a third party release that was upheld in Manville I.  In substance, the settlement and plan injunctions barred any claims that were based upon, arose out of or were related to Manville's liability policies, and channeled those claims to the Manville Trust.  Manville II, 517 F.3d at 57.

Following confirmation, various groups of plaintiffs brought actions against the settling insurers ("Travelers") asserting statutory or common law claims (the "Direct Actions").  Some of these plaintiffs asserted claims pertaining to their settlement negotiations with Travelers acting on behalf of Manville, or to their decision not to file claims against Manville because Travelers suppressed pertinent information that it had acquired in the long course of insuring against asbestos liability.  Id. at 57–58.  Others contended that Travelers had violated a common law duty to disclose asbestos-related information that it had acquired during its long tenure as Manville's primary insurer.  Id. at 58.  In response to these suits, several classes of plaintiffs settled with Travelers, and the Bankruptcy Court issued an order clarifying that the 1986 injunctions covered the Direct Claims.  Id. at 58–59.  Several objecting claimants appealed, and after the District Court affirmed the clarifying order in substantial part, the objecting parties next appealed to the Second Circuit.

The Court of Appeals focused squarely on the Bankruptcy Court's jurisdiction. Id. at 61 ("[T]he bedrock jurisdictional issue in this case requires a determination as to whether the bankruptcy court had jurisdiction over the disputed statutory and common law claims.")  The Court had "little doubt" that the Direct Actions were covered, "in a literal sense," by the 1986 injunctions. Id. at 67.  Nevertheless, relying heavily on the Fifth Circuit's analysis in In re Zale Corp., 62 F.3d 746 (5th Cir. 1995), the Court concluded that the bankruptcy court lacked subject matter jurisdiction to enjoin the Direct Actions.

In assessing a court's jurisdiction to enjoin a third party dispute, the question is not whether the court has jurisdiction over the settlement, but whether it has jurisdiction over the attempts to enjoin the creditors' unasserted claims against the third party.  Manville II, 517 F.3d at 65; Zale, 62 F.3d at 755; see Shearson Lehman Bros., Inc. v. Munford, Inc. (In re Munford, Inc.), 97 F.3d 449, 454 (11th Cir. 1996) ("It is not the language of the settlement agreement that confers subject matter jurisdiction in this case.  Rather, it is the 'nexus' of those claims to the settlement agreement . . . that the bankruptcy court must approve . . . .")  "Related to" jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, or the dispute would have an effect on the estate.[20] Manville II, 517 F.3d at 65; Zale Corp., 62 F.3d at 753.  A bankruptcy court does not acquire subject matter jurisdiction "to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate." Manville II, 517 F.3d at 66.  Otherwise, "a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a

_____

[20]    Since "related to" or non-core jurisdiction is sufficient, it is not necessary to consider the extent of a court's core jurisdiction.

plan in such a way that it depended upon third-party contributions." Id. (quoting In re

Combustion Eng'g, Inc., 391 F.3d 190, 228 (3d Cir 2004)).

The Court explained that in Manville I, subject matter jurisdiction existed because

MacArthur's rights were derivative, MacArthur sought to collect from the proceeds of

Manville's insurance policy on the basis of Manville's own conduct, and its claims were

inseparable from Manville's own insurance policy, an asset of the Manville estate. Manville I,

837 F.2d at 92–93; accord Manville II, 517 F.3d at 62. In contrast, the Direct Action claims

sought to recover directly from Travelers based upon Travelers' own independent wrongdoing.

Manville II, 517 F.3d at 65. They made no claims against Manville's insurance coverage, nor

any other asset of the estate, "nor do their actions affect the estate." Id. Accordingly, the

bankruptcy court lacked jurisdiction to enjoin the Direct Actions. Id.

Travelers appealed to the Supreme Court, which agreed with the Second Circuit that the

Direct Actions were barred by the 1986 injunctions. Travelers Indemnity Co. v. Bailey, 129 S.

Ct. 2195, 2203 (2009). Consequently, "[s]o long as respondents or those in privity with them

were parties to the Manville bankruptcy proceeding, and were given a fair chance to challenge

the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting

enforcement of the 1986 Orders." Id. at 2206. In other words, res judicata barred a challenge

more than twenty years later by anyone bound by the 1986 orders. The Supreme Court offered

no view on the propriety of the 1986 injunctions, and remanded the case to consider whether any

of particular respondents was bound. Id. at 2207.

Following remand, the Second Circuit determined that Chubb Indemnity Insurance Co.

("Chubb") was not bound by the 1986 injunctions, and hence, could "attack the Orders

collaterally as jurisdictionally void." Manville III, 2010 WL 1007832, at *20.  More

importantly, the Court adhered to the decision in Manville II, and concluded that Chubb's

collateral attack was meritorious. Id.  Accordingly, Manville II remains the law of the Second

Circuit.

As a result, before the Bankruptcy Court decides whether the proponent of a plan

settlement injunction has demonstrated the "unusual circumstances" mandated by Metromedia, it

must first decide whether it has subject matter jurisdiction under Manville II.  See In re Metcalfe

& Mansfield Alternative Investments, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010) ("[T]he

subsequent decision in Manville raises a question whether meeting the Metromedia standard is

enough.  Metromedia did not address the jurisdictional issue considered by the Second Circuit

panel in Manville.").  The inquiries may nevertheless overlap.  A third party action that will

directly and adversely impact the reorganization is more likely to present the "unusual

circumstances" required under Metromedia.

2.      **The Proposed Injunction**

Although the case law discussed above dealt with plan injunctions, the same

jurisdictional principles apply to injunctions required by non-plan settlements.  See In re Mrs.

Weinberg's Kosher Foods, Inc., 278 B.R. 358, 364–66 (Bankr. S.D.N.Y. 2002).[21]  Certain

aspects of the Bar Order, in this regard, plainly fall within the Court's subject matter jurisdiction.

For example, the Court has jurisdiction to bar general creditors of the estates from seeking to

recover their claims from the funds transferred to GSO.  Hirsch v. FDIC (In re Colonial Realty

Co.), 980 F.2d 125 (2d Cir. 1992), which dealt with an analogous issue, illustrates this principle.

---

[21]         In fact, a third-party plan injunction is often a component of a settlement between the estate and a
nondebtor that is incorporated into the plan.

In Colonial Realty, the debtor owed the FDIC in excess of $66,000.  The FDIC commenced a

post-petition action in Florida federal court under non-bankruptcy fraudulent transfer law to

recover property that the debtor had transferred before bankruptcy.  Id. at 127–28.  In response,

the debtor's trustee sought an order from the Bankruptcy Court determining that the Florida

action violated the automatic stay, and sought an injunction to prevent the continuation of that

suit.  Id. at 128.  The Bankruptcy Court granted the requested relief, id. at 129, and the District

Court affirmed.  Id. at 130.

The Second Circuit also affirmed.  Although the transferred property would not become

property of the estate until it was recovered, Colonial Realty Co., 980 F.2d at 132; see 11 U.S.C.

§ 541(a)(3), the FDIC's pursuit of the transferred property was an action "to recover a claim

against the debtor that arose before the commencement of the case" within the meaning of 11

U.S.C. § 362(a)(1).  Colonial Realty, 980 F.3d at 132.  Two characteristics of the FDIC action

informed the Court's conclusion.  "Absent a claim against the debtor, there is no independent

basis for the action against the transferee.  Moreover, the creditor can only recover property or

value thereof received from the debtor sufficient to satisfy the creditor's claim against the

debtor."  Id. (quoting In re Saunders, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989)).  Accordingly,

"the injunctive order issued in this case to implement the stay was in a sense superfluous,

prompted only by the FDIC's indication that a specific injunctive order would be required to

induce its compliance with the statutory stay."  Id. at 137.

The Court's jurisdiction to make the automatic stay permanent following the settlement

of a fraudulent transfer claim follows logically from Colonial Realty.  The Trustees are the sole

parties with standing to prosecute avoidance claims, Keene Corp. v. Coleman (In re Keene

Corp.), 164 B.R. 844, 850 (Bankr. S.D.N.Y. 1994), and the application of the automatic stay

reflects the recognition that a creditor's attempt to recover its claim against the estate from GSO will interfere with Trustees' ability to pursue recoveries for the benefit of all creditors of the estates.  See id. (trustee alone has standing to pursue fraudulent transfer claims, and this "promotes the principle of equitable distribution").  The same interference will occur if the Bankruptcy Court cannot enjoin similar suits on a permanent basis.  Absent that power, the Trustees will be hampered in their ability to pursue and ultimately settle fraudulent transfer claims from a transferee fearful of paying twice for the same transfer—once on the Trustees' claim and a second time on the derivative claim.  Cf. Drexel, 960 F.2d at 293 (The third party injunction "enables the directors and officers to settle these suits without fear that future suits will be filed.  Without the injunction, the directors and officers would be less likely to settle.").  Moreover, the same principle applies to any effort by a creditor of the estate to prosecute a derivative claim against GSO.  Accordingly, the Court has the jurisdiction, and may appropriately exercise that jurisdiction, to bar general creditors of these estates from recovering their claims from GSO, where their claims are based on the debtors' misconduct, and there is no independent basis for an action against GSO other than its receipt of the transfers from LLP.

The Bar Order, however, goes well beyond derivative claims, and ultimately exceeds the Court's subject matter jurisdiction.  While the Bar Order is limited to creditors and parties in interest in the LLP and Dreier cases, these parties may also have direct claims against GSO relating to the debtors or the Notes that are unrelated to their status as creditors or parties in interest.  For example, they may be GSO investors who have claims against GSO sounding in negligence or breach of fiduciary duty based upon GSO's decision to purchase the Notes or disclosure-related fraud claims against GSO concerning their decisions to invest in GSO.  As investors, they may have contractual rights to compel GSO to distribute the balance of the

payments.  Finally, they may be GSO creditors who have claims based upon GSO's fraudulent transfer of the remaining Notes proceeds to GSO Releasees.

This is not intended to be an exhaustive list, and it is up to the parties to craft an injunction that passes muster.  Rather, the examples simply illustrate several types of potential independent claims that could arise from GSO's own wrongful conduct relating to the debtors or the Notes.[22]  Such claims do not affect property of the estate or the administration of the estate beyond GSO's insistence that the GSO Settlement Agreement must include the Bar Order, and the Court lacks subject matter jurisdiction to enjoin their prosecution.

Another problem concerns the vague identity of the "GSO Releasees."  The latter term includes the "GSO Parties," defined to mean "GSO Capital Partners LP . . . , its affiliates and all entities controlled or managed by GSO or one of its affiliates."  (GSO Settlement Agreement at 1.)  The GSO Releasees also include the GSO Parties'

> affiliates, directors, officers, employees, representatives and agents, and respective past or present direct or indirect stockholders, affiliates, limited partners, investors or other equity holders, and any entity controlled or managed by any GSO Party, and each of their successors, assigns and transferees and each of their respective past or present officers, directors, employees, agents, legal representatives, privies, representatives, accountants, attorneys, and any party subject to an indemnity relating to Marc Dreier, Dreier LLP, and the Note Fraud Funds by a GSO Party.

(Id. ¶ 2, at 5.)  Under the broad definition, the release applies to the unnamed entities that GSO's unnamed affiliates control or manage, any entity that the controlled or managed entity itself controls or manages, and to their successors, assigns, and transferees and their "respective past or present officers, directors, employees, agents, legal representatives, privies, representatives,

---

[22]    This is not intended to imply that such claims are viable.

accountants, attorneys." Suffice it to say, there is substantial uncertainty regarding who is being released and for what.

If the Bar Order is limited to derivative claims, much of the vagueness disappears. In that event, the beneficiary of the release is determined mainly by the nature of the claim asserted and less so by the identification of the releasee in the Bar Order. Nevertheless, references to entities that manage or control other entities, which in turn manage and control other entities, and all of their past and present officers, directors, equity holders and agents, is a recipe for future litigation. When the Court raised this issue at oral argument, counsel for Gowan stated that she had no objection to naming the releasees. (Tr. (2/2/10) at 23–24.) Consequently, any modified Bar Order should identify the releasee, or at a minimum, provide objective criteria that will enable this or another court to identify whether a claim asserted against GSO in a future litigation was released under the Bar Order.

**E.     Gardi**

**1.     Gardi Is "Similarly Situated"**

The foregoing discussion focused on the Court's jurisdiction and authority to limit the right of a general creditor to pursue its claims against third parties. Gardi contends that he stands on different footing for two reasons. First, he maintains that he is "uniquely situated" as a defrauded client rather than investor in Dreier's Ponzi scheme. (Gardi Settlement Objection at ¶ 35.) Second, he contends that the JANA settlement payments that GSO received actually belonged to him, LLP lacked legal and equitable title to the funds, (see id. at ¶ 15 n.2), and he can trace a substantial portion of those proceeds into a GSO account. (Id. at ¶ 38.) The traceable funds are, therefore, subject to a constructive trust for his benefit. (Id. ¶ at 38 n.7.) The Bar

Order cuts off his right to trace the funds, which he seeks permission to do through his Lift Stay

Motion.

The right of a Ponzi scheme victim to trace his investment, and gain priority over other

victims, is severely limited.  SEC v. Credit Bancorp, Ltd., 290 F.3d 80 (2d Cir. 2002) explains

why.  There, the defendant operated a Ponzi scheme.  The SEC commenced an action and

obtained the appointment of a receiver.  The receiver recovered assets, and proposed to distribute

them on a pro rata basis to the victims of the Ponzi scheme.  One investor (SECO) claimed it

could trace its investments into the property held by the receiver, and objected to pro rata

distribution.  Affirming the pro rata distribution scheme, the Second Circuit ruled:

> [W]hatever beneficial interest SECO might have in the transferred shares, arising
> from a constructive trust, does not defeat the equitable authority of the District
> Court to treat all the fraud victims alike (in proportion to their investments) and
> order a pro rata distribution.  Courts have favored pro rata distribution of assets
> where, as here, the funds of the defrauded victims were commingled and where
> victims were similarly situated with respect to their relationship to the defrauders.

Id. at 88–89 (emphasis added).  The Court emphasized that use of a pro rata distribution scheme

is "especially appropriate for fraud victims of a 'Ponzi scheme,'" where earlier investors are paid

from the funds invested by "unwitting newcomers rather than through legitimate investment

activities."  Id. at 89 (citations and internal quotation marks omitted).

The District Court has already rejected Gardi's contention that as a client, he is not

"similarly situated" with respect to the investor victims or non-individual client victims.  He

made that precise argument when he sought relief from the pro rata distribution provisions of the

Second Amended Restitution Order.  Judge Rakoff denied Gardi's motion, emphasizing that

Gardi was not the only client victim, the ultimate Note fraud victims included individuals and

charitable and educational institutions, each victim's case involved its own nuances, and the

35

alternative to <u>pro rata</u> distribution would require a costly and expensive inquiry into each victim's loss. (<u>District Court Opinion</u> at 11–12.)

The principle of equitable distribution applicable in bankruptcy compels the same conclusion here. Dreier's massive fraud randomly destroyed everyone in its path, some more than others. As discussed below, another victimized client suffered an even larger loss. Dreier used the investor proceeds to fund LLP's operations, and used LLP's funds to repay earlier investors. Each victim, investor or client, has its own unique story. Yet all are victims of a "unified scheme to defraud," <u>SEC v. Byers</u>, 637 F. Supp. 2d 166, 181 (S.D.N.Y. 2009) (internal quotation marks omitted), and it would be unfair to other client and investor victims to grant a priority to Gardi. All are "similarly situated" in their relationship to Dreier.

### 2.  Gardi's Property Interests

Gardi's objection to the GSO Settlement also assumes that LLP lacked any legal or equitable interest in the JANA funds and held those funds in constructive trust for his benefit. He reasons that he is entitled to trace those funds into the hands of GSO, and objects to the Bar Order because it cuts off that right.

A constructive trust is a form of restitution in equity through which one with legal rights in property is compelled to transfer title to another who, in equity and good conscience, is the true "owner." 1 Dan B. Dobbs, Dobbs Law of Remedies: Damages – Equity – Restitution § 4.3(1), at 587 (2d ed. 1993) ("Dobbs"). When a wrongdoer uses property of the claimant to discharge the wrongdoer's debt, the claimant can follow the property, and recover it from a transferee who was not a <u>bona fide</u> purchaser for value. V Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts § 521.2, at 660 (4th ed. 1989) ("Scott on Trusts");

see RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 58(2) (Tentative Draft

No. 6, 2008).  Though analogized to a trust, a constructive trust is not a trust at all, but an

equitable remedy designed to prevent unjust enrichment.  Strom v. Goldman, Sachs & Co., 202

F.3d 138, 144 (2d Cir.1999) (quoting I SCOTT ON TRUSTS); accord 1 DOBBS § 4.3(2), at 590; see

Counihan v. Allstate Ins. Co., 194 F.3d 357, 361 (2d Cir. 1999).  In other words, "(the

constructive trustee) is not compelled to convey the property because he is a constructive trustee;

it is because he can be compelled to convey it that he is a constructive trustee."  Simonds v.

Simonds, 380 N.E.2d 189, 194 (N.Y. 1978) (quoting V SCOTT ON TRUSTS § 462, at 306); accord

Cassirer v. Sterling National Bank & Trust Co. (In re Schick), 246 B.R. 41, 45 (Bankr. S.D.N.Y.

2000).

        Initially, Gardi's assumptions regarding his interests versus LLP's interests in the JANA

funds, and his right to trace those funds, are open to some doubt.  JANA voluntarily wired

money to LLP, although fraudulently induced to do so.  Thus, it parted with title to and

possession of the funds.  LLP acquired legal title when Dreier deposited the JANA funds into the

commingled LLP account, and Gardi would have to trace the funds to obtain a priority over the

estates' general creditors.  See In re Advent Corp., 104 F.3d 293, 296 (9th Cir. 1997); Rupp v.

Mayberry (In re Crocker Cos.), No. 2:05–CV–599 TS, 2007 WL 3333274, at *4 n.8 (D. Utah

Nov. 8, 2007); Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 602 (2d Cir.

B.A.P. 2000); Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999)

(collecting cases).  While ordinarily "a thief cannot convey a good title to stolen property,"

Newton v. Porter, 69 N.Y. 133, 137 (1877), a transferee "acting in good faith may obtain title to

money from a thief."  SEC v. Universal Express, Inc., No. 04 Civ. 2322 (GEL), 2008 WL

1944803, at *3 (S.D.N.Y. Apr. 30, 2008) (Lynch, J.) (internal quotation marks omitted).  The

Trustees agreed to settle the fraudulent transfer claim, in part, because Gowan's investigation did not turn up any evidence of GSO's bad faith. Gardi has not questioned her conclusion or offered contrary evidence of GSO's bad faith, and GSO's good faith would cut off his right to trace.

In addition, as the Committee points out, there was no meeting of the minds, and Dreier lacked actual authority to enter into the JANA settlement, although he may have had apparent authority. Furthermore, and quite understandably, Gardi has not ratified the JANA settlement. (Tr. (2/2/10) at 48.) Thus, to the extent a constructive trust should be imposed, the beneficiary may be JANA rather than Gardi.

In any event, even if LLP held the JANA funds in constructive trust for Gardi's benefit under the common law, recent Second Circuit rulings, as well as decisions by Courts of Appeals in other Circuits, counsel against automatically recognizing constructive trusts in bankruptcy. Although bankruptcy will apply constructive trust law in appropriate circumstances, e.g., Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88 (2d Cir. 1989), a bankruptcy court must "'act very cautiously' to minimize conflict with the goals of the Bankruptcy Code." Superintendent of Insurance v. Ochs (In re First Central Fin. Corp.), 377 F.3d 209, 217 (2d Cir. 2004) (quoting In re North Am. Coin & Currency, Ltd., 767 F.2d 1573, 1575 (9th Cir.1985)). The imposition of a constructive trust grants a priority to the beneficiary of the constructive trust, and is fundamentally at odds with the principle of equal distribution among creditors. In re Flanagan, 503 F.3d 171, 182 (2d Cir. 2007) ("[T]he effect of a constructive trust in bankruptcy is to take the property out of the debtor's estate and to place the constructive trust claimant ahead of other creditors with respect to the trust res. . . . This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code."); First Central, 377 F.3d at 217 ("[B]y creating a

separate allocation mechanism outside the scope of the bankruptcy system, 'the constructive trust doctrine can wreak . . . havoc with the priority system ordained by the Bankruptcy Code.'") (quoting In re Haber Oil Co., 12 F.3d 426, 436 (5th Cir.1994) (ellipsis in original)); In re Omegas Group, Inc., 16 F.3d 1443, 1451 (6th Cir.1994) ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor.") (footnote omitted).

Because the constructive trust in bankruptcy harms other creditors rather than the debtor, the equities that will support the imposition of a constructive trust under the common law do not necessarily support the imposition of the same constructive trust in bankruptcy.  It is "important to carefully note the difference between constructive trust claims arising in bankruptcy as opposed to those that do not, as the 'equities of bankruptcy are not the equities of the common law.'"  First Central, 377 F.3d at 218 (quoting Omegas Group, 16 F.3d at 1452); accord In re Ades & Berg Group Investors, 550 F.3d 240, 245 (2d Cir. 2008) ("[R]etention by the bankruptcy estate of assets that, absent bankruptcy, would go to a particular creditor is not inherently unjust.").  Although the trustee's recovery of the disputed property enriches the bankrupt estate, the estate is not "unjustly" enriched.  First Central, 377 F.3d at 218; see Flanagan, 503 F.3d at 182 (affirming bankruptcy court's refusal to impose a constructive trust because beneficiaries' "make no argument as to why Flanagan's bankrupt estate or, more to the point, Flanagan's general creditors, would be unjustly enriched by the estate's continued ownership interest in the Thompson & Peck stock").

The reluctance to allow tracing and impose a constructive trust in bankruptcy is particularly compelling when it involves the commingled proceeds of a Ponzi scheme.  The law applicable to equitable receiverships prohibits tracing, and promotes pro rata distribution to

"similarly situated" victims of a Ponzi scheme.  In such circumstances, the beneficiary's

equitable interest in property "does not defeat the equitable authority of the District Court to treat

all the fraud victims alike . . . ."  <u>Bancorp</u>, 290 F.3d at 88.  The same principles of equitable

distribution animate bankruptcy, and also support <u>pro rata</u> distribution.

Judge Rakoff's recent decision involving a similar claim by another LLP client bolsters

this conclusion.  (<u>See</u> <u>Memorandum Order</u>, dated Mar. 22, 2010 (ECF Doc. # 145 in <u>United</u>

<u>States v. Dreier</u>, No. 09-cr-85).)  LLP had served as counsel to the chapter 11 estates of

360networks (the "360 Estates").  In the course of its representation, LLP recovered proceeds

through preference litigation, but Dreier stole or converted over $50 million of 360 Estates'

money.  <u>Id.</u> at 1–2.  The 360 Estates contended that Dreier used the stolen funds to purchase

certain artwork subject to forfeiture, and sought to impress a constructive trust on the artwork for

its benefit.  <u>Id.</u> at 2.

Relying on the principles limiting the imposition of constructive trusts in bankruptcy, the

District Court held that "[a]nalogous considerations counsel against imposing a constructive trust

over forfeited property for the benefit of certain petitioning crime victims where, as here, doing

so would harm other crime victims also seeking to recover from the same limited pool of

forfeited assets."  <u>Id.</u> at 4.  The imposition of a constructive trust would be "unfair both to the

other client victims, whose funds were likewise stolen in connection with a fiduciary relationship

and to the note fraud victims, a category that includes not only the gulled hedge funds

themselves but also, indirectly, the numerous individuals and institutions whose monies these funds managed." Id. at 5.[23]

Similarly, Gardi's attempt to trace the GSO funds would cause prejudice to the creditors and the estates, and grant him a priority in payment at the expense of the general creditors. Gowan is pursuing the GSO payments for the benefit of all creditors.  Any settlement proceeds or, failing a settlement, any litigation recovery will enrich the creditors but not unjustly. Moreover, the claims of all creditors, including Gardi, will be channeled into the settlement fund (as well as the other estate assets).  Accordingly, assuming (without deciding) that Gardi could successfully impose a constructive trust under applicable non-bankruptcy law, I conclude that Gardi is not entitled to impose a constructive trust on the JANA funds.  His objections to the GSO Settlement, including his objection that the Bar Order prevents him from pursuing the JANA funds, are, therefore, overruled.  Lastly, because he is not entitled to trace the funds and impose a constructive trust, the Lift Stay Motion is denied without prejudice to renewal should the Trustees abandon their claims against GSO.  See Keene, 164 B.R. at 857.

---

[23]     The preceding discussion centered on the rights to impose a constructive trust in property held by the trustee, or in the case of 360 Estates, held by the Government.  The same principles apply where the debtor transferred the stolen property, and the defrauded party seeks to trace the property into the hands of a third party. This precise situation was presented in In re Newpower, 233 F.3d 922 (6th Cir. 2000).  There, the debtor had embezzled funds entrusted to him by the Kitchens.  The debtor had transferred some of these funds to third parties, and the Kitchens had commenced a pre-petition action against the transferees.

The Court concluded that the Kitchens' had equitable title to all of the misappropriated property and its proceeds, and granted the Kitchens' motion for relief from the automatic stay to trace the property into the hands of the transferees and seek to impose a constructive trust.  Id. at 934.  The Newpower Court recognized that its prior decision in Omegas Group (on which the Second Circuit relied in First Central) spoke "negatively of constructive trusts in bankruptcy proceedings," id. at 936-37, but identified two questions not presented to the Omegas Group Court: whether the victim should be granted relief from the stay to continue a pre-petition action to trace the stolen funds, and whether the bankruptcy court may give effect to a state court judgment imposing a constructive trust.  Id. at 937.

The Newpower decision implicitly acknowledged that the Omegas Group rule, which involved an effort to impose a constructive trust on property in the trustee's possession, governed the Kitchens' right to pursue transferred property, but distinguished the facts.  The distinction does not apply to Gardi, who never commenced a pre-petition action to impress a constructive trust.

## CONCLUSION

The motion to approve the Settlements is denied without prejudice to the submission of a

new Settlement with a more narrowly tailored permanent injunction consistent with this opinion.

Gardi's Lift Stay Motion is denied without prejudice.  Settle order on notice.


Dated: New York, New York
      April 28, 2010


            /s/  *Stuart M. Bernstein*
            STUART M. BERNSTEIN
         United States Bankruptcy Judge