PRYOR CASHMAN LLP
Mark R. Jacobs (MJ-6248)
Robert M. Fleischer (RF-9099)
Seth H. Lieberman (SL-4880)
7 Times Square
New York, New York 10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
mjacobs@pryorcashman.com
rfleischer@pryorcashman.com
slieberman@pryorcashman.com

Attorneys for Elisa P. Dreier

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| MARC S. DREIER, | ) Chapter 7 |
| | ) |
| Debtor. | ) Case No. 09-10371 (SMB) |
| | ) |

**OBJECTION OF ELISA P. DREIER TO CHAPTER 7 TRUSTEE'S MOTION UNDER RULE 3007 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE SEEKING ENTRY OF AN ORDER: (i) DISALLOWING A PORTION OF CLAIM 14 FILED BY ELISA DREIER; AND (ii) RECLASSIFYING A PORTION OF CLAIM 14 FILED BY ELISA DREIER AS A GENERAL UNSECURED CLAIM**

Elisa P. Dreier ("Ms. Dreier"), the ex-wife and creditor of Marc S. Dreier, the debtor (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case"), by and through her undersigned counsel, hereby submits her objection to the motion of the Salvatore LaMonica, Esq., the Chapter 7 Trustee (the "Trustee") of the Debtor's bankruptcy estate, for entry of an Order under Rule 3007 of the Federal Rules of Bankruptcy Procedure: (i) disallowing that portion of claim number 14 filed by Ms. Dreier that was an allegedly unmatured domestic support obligation ("DSO") as of the filing of the bankruptcy petition; and (ii) reclassifying the

balance of the Claim as a general unsecured, non-DSO claim against the Debtor's estate (the "Claim Objection"). In support whereof, Ms. Dreier respectfully represents as follows:

## I. PRELIMARY STATEMENT

1. The essential issue to be determined by the Court in resolving the Trustee's Claim Objection is whether the Divorce Agreement (defined below) entered into between Ms. Dreier and the Debtor in December, 2003 (the "Divorce Agreement"), provides for the acceleration of the Debtor's Domestic Support Obligations following his default in the payment of his domestic support obligations. A copy of the Divorce Agreement is attached hereto as Exhibit "A." If not explicit, such acceleration is implicitly provided based on the language of the Divorce Agreement. Furthermore, the Court may properly consider extrinsic evidence of the parties' negotiations leading up to the execution of the Divorce Agreement, which clearly demonstrates their intention to provide for the acceleration of the Debtor's domestic support obligations following a default by him in the payment of such obligations. Such extrinsic evidence includes a written Term Sheet (defined below) executed by the Debtor and Ms. Dreier which plainly provides for acceleration of the Debtor's support obligations following his default in paying those obligations. A copy of the term sheet is annexed hereto as Exhibit "B."

2. The Chapter 7 Trustee further argues in his Claim Objection that a portion of Ms. Dreier's Claim is not in the nature of alimony, maintenance or support, but rather, equitable distribution, and must be reclassified accordingly. Ms. Dreier agrees that that a portion of her Claim is in fact for Equitable Distribution rather than accelerated DSO, and will be prepared, at a hearing on the Claim Objection, to describe and explain the portion of her Claim that should be classified as Equitable Distribution (and therefore non-dischargeable under Bankruptcy Code Section 523(a)(15)).

## II. FACTUAL BACKGROUND

3. Pursuant to the Divorce Agreement, the Debtor became obligated to make certain domestic support payments to Ms. Dreier.

4. On December 4, 2008, in <u>United States of America v. Marc S. Dreier</u>, Case No. 08 Mag. 2676 (JSR) (the "Criminal Case"), the United States Attorney for the Southern District of New York (the "US Attorney") filed a criminal complaint charging the Debtor with securities and wire fraud violations (and, in a superseding indictment, money laundering). The Criminal Case was assigned to United States District Court Judge Jed S. Rakoff. Federal authorities arrested the Debtor on December 7, 2008.

5. On December 8, 2008, in <u>SEC v. Dreier</u>, Case No. 08-civ-10617 (MGC), the United States Securities and Exchange Commission charged the Debtor with violations of the securities laws by selling, and offering to sell, fictitious notes purportedly issued by a New York City-based real estate development company.

6. Thereafter, United States District Judge Miriam Goldman Cedarbaum appointed Mark F. Pomerantz as receiver (the "Receiver") of the Debtor's assets, including the Debtor's interests in the various operating law firms and certain of the Debtor's affiliated entities.

7. On December 16, 2008, the Receiver of Dreier LLP commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "LLP Chapter 11 Case"). On December 30, 2008, the United States Trustee for the Southern District of New York appointed Sheila M. Gowan as the chapter 11 trustee for the LLP Chapter 11 Case, which appointment was approved by the Court on January 9, 2009 (the "Dreier LLP Trustee").

8. On January 12, 2009, the Honorable Colleen McMahon, sitting in Part I, signed a Consent Order for Extension of Pre-Indictment Restraining Order and Seizure of Property

Pursuant to 18 U.S.C. § 982(b)(1) and 21 U.S.C. §§ 853(e) and (f) (the "Consent Order"). The Consent Order authorized the United States Marshals Service ("USMS") to seize and maintain custody of, among other things, the Debtor's real properties, pending the resolution of the Criminal Case.

9. On January 26, 2009, petitioning creditors, (i) the Dreier LLP Trustee, (ii) Wachovia Bank, N.A. and (iii) Steven J. Reisman, Postconfirmation Representative of the Bankruptcy Estates of 360networks (USA) Inc., filed an involuntary petition for relief against the Debtor pursuant to chapter 7 of the Bankruptcy Code.

10. An Involuntary Summons was issued on January 28, 2009 and served on the Debtor on January 30, 2009. The Bankruptcy Court entered an Order for Relief on March 1, 2009.

11. By Notice of Appointment, dated March 2, 2009, Salvatore LaMonica, Esq. was appointed as the interim chapter 7 Trustee of the Debtor's bankruptcy estate and he is now the permanent Trustee of the Debtor's estate.

12. The Receivership was dissolved by order of the United States District Court for the Southern District of New York dated April 3, 2009.

13. Prior to the commencement of the Debtor's Bankruptcy Case, the Debtor defaulted on his domestic support obligation payments under the Divorce Agreement. Specifically, in December 2008, the Debtor was in default of numerous provisions of the Divorce Agreement, including his obligations to pay child support to Ms. Dreier. In accordance with the terms of the Divorce Agreement, the Debtor's pre-petition default resulted in the acceleration of his domestic support obligations.

14. By order of this Court entered on October 20, 2009 (Doc. No. 80), January 15,

2010 was fixed as the bar date to file proofs of claim in this Bankruptcy Case. On November 17, 2010, Ms. Dreier timely filed a proof of claim (designated in the Debtor's Claim Register as claim no. 14-1) (the "DSO Claim"), wherein Ms. Dreier asserted a priority claim in the amount of $7,105,102 for "Support and Maintenance." The DSO Claim includes, but is not limited to, domestic support obligations that became due and owing before the Debtor's bankruptcy by virtue of express or implicit acceleration provisions set forth in the Divorce Agreement (the "Accelerated DSO Obligation").

15. At hearings before the Bankruptcy Court on May 18, 2010 and June 4, 2010, the Trustee disputed the validity of the Accelerated DSO Obligations, and called the soundness of said claim into question before the Bankruptcy Court.

16. On August 5, 2010, Ms. Dreier filed a motion (the "Stay Relief Motion") for entry of an order (i) finding the automatic stay does not apply to the Accelerated DSO Obligation (as defined in the Stay Relief Motion) or, in the alternative, (ii) granting relief from the automatic stay for cause if the automatic stay does apply, and (iii) abstaining from a determination of the Accelerated DSO Obligation (Dkt. No. 219). By the Stay Relief Motion, Ms. Dreier seeks this Court's approval to allow her to proceed in the Matrimonial Court to obtain a determination as to the extent and amount of the Accelerated DSO Obligation. If the Stay Relief Motion is granted, Ms. Dreier intends to submit the dispute concerning the Accelerated DSO Obligation to the Matrimonial Court for determination. Specifically, she intends to seek an order from that court determining or clarifying that the Divorce Agreement provides, either expressly or implicitly, for the acceleration of all future domestic support obligations specified in the Divorce Agreement upon default and that such acceleration occurred prior to the commencement of the Debtor's Bankruptcy Case. The Court scheduled a hearing on the Stay Relief Motion for September 14,

2010.

17. On August 10, 2010, the Trustee filed his Claim Objection. The Court scheduled a hearing on Claim Objection for September 14, 2010, the same date as the hearing previously scheduled for the Stay Relief Motion. On August 16, 2010, Ms. Dreier's counsel wrote to the Court and requested a continuance of the hearing on the Claim Objection until after the Court determined the Stay Relief Motion. The Trustee opposed any continuance of the Claim Objection. During a status conference conducted in this case on August 24, the Court denied Ms. Dreier's request for a continuance of the Claim Objection.[1]

### III. ARGUMENT

**A. Elisa Dreier Is Entitled To An Allowed Claim For Accelerated Domestic Support Obligations**

**1. The Divorce Agreement Implicitly Provides For Acceleration Of The Debtor's DSO Obligations**

18. The Chapter 7 Trustee contends that the portion of Ms. Dreier's Claim pertaining to the Accelerated DSO Obligation must be disallowed because, in the Trustee's view, the Divorce Agreement does not provide for acceleration of the Debtor's DSO Obligations.

19. In deciding this question, the Court must determine what is expressly and implicitly included in the Divorce Agreement in order to account for what was contemplated under the agreement. See Long Island R.R. Co. v. Int'l Ass'n of Machinists, 874 F.2d 901, 908 (2d Cir. 1989) (citing Nw. Airlines, Inc. v. Air Line Pilots Ass'n Int'l, 442 F.2d 246 (8th Cir. 1970) (sympathy strike enjoinable under minor dispute resolution procedures of Railway Labor Act notwithstanding absence of no strike clause because contract may arguably be interpreted as

---

1. Ms. Dreier and her counsel maintain that the Court should hear and resolve the Stay Relief Motion before determining the Trustee's Claim Objection. In light of the Court's denial on August 24, 2010 of Ms. Dreier's request for continuance of the Claim Objection pending resolution of the Stay Relief Motion, Ms. Dreier submits this Objection without waiver, and with full reservation of her rights and arguments concerning the Stay Relief Motion.

implicitly prohibiting honoring of picket lines)); Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1085 (2d Cir. 1985) (Second Circuit acknowledging that it is "called upon to interpret the explicit and implicit terms of [the] contract"); Highland Mech. Indus. v. Herbert Constr. Co., 216 A.D.2d 161, 162 (N.Y. App. Div. 1994) (while the contract at issue did not provide for when the contractual limitation period began, the court found that "the only reasonable interpretation of this clause is that it is implicit that the contractual limitation period only begins to run upon notification of payment by the contractor to its subcontractor); In re Bd. of Higher Educ., 362 N.Y.S.2d 985, 989 (N.Y. Spec. Term 1975) (deciding that "the right to arbitrate, upon choice of a superior forum[,] is implicit in this contract"). Furthermore, when interpreting a contract under New York law, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized. See Herzfeld v. Herzfeld, 857 N.Y.S.2d 169, 169 (2008) (quoting Fetner v. Fetner, 741 N.Y.S.2d 256, (2002); Costello v. Casale, 723 N.Y.S.2d 44 (2001); W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157 (1990).

20. Looking within the four corners of the Divorce Agreement, it is sufficiently clear that the Debtor and Ms. Dreier had, when they entered into the Divorce Agreement in 2003, contemplated acceleration of all the Debtor's domestic support obligations in the event of his default and that such acceleration is expressly and implicitly included in the agreement.

21. To begin with, an overview of certain key provisions of the Divorce Agreement is in order:

*General:*
- The Divorce Agreement expresses the parties' desire and intention to resolve "all financial, property, custody and child support rights" between the parties. (Recital F, p. 1).
- At the time of the agreement, the parties' two children were 14 and nearly 12 years old. (Recital B, p.1).

*Child and Spousal Support:*
- The Debtor is obligated to pay basic child support of $60,000 per year ($5,000 per month) following the parties' divorce (Article VIII, ¶1), plus such additional items —known as "add-ons" — such as medical insurance; unreimbursed medical costs; summer camp/activities; and private school, extra-curricular, college and graduate education (Article VIII, ¶¶4-10).
- The Debtor is obligated to pay basic child support until the youngest child reaches 21, or 25 if she is matriculated as a full-time student at an undergraduate college or graduate school (Article VIII, ¶16 – defining "Emancipation").
- The Debtor is obligated to pay Ms. Dreier basic spousal support of $35,000/month for the first 96 months following the parties' divorce (Article X, ¶2) and then $10,000/month for an additional 84 months (Article X, ¶4), for a total of 180 months (15 years).
- In addition, the Debtor is obligated to pay Ms. Dreier $100,000 on the 2nd, 5th and 8th anniversaries of their divorce (Article X, ¶6).

*Asset Distribution Provisions Relating to Child and Spousal Support:*
- The Divorce Agreement provides for the Debtor to take sole ownership of the parties' jointly owned home in Westhampton (the "Westhampton House"), provided that he pays Ms. Dreier for her interest in that home with an initial payment of $250,000 to Ms. Dreier within 30 days of their divorce, with the balance due 45 days thereafter (Article IV, ¶¶21, 22, and 62).[2]
- Ms. Dreier has the right, but not the obligation, to sell the Westhampton House upon various defaults under the Agreement, such as the Debtor's failure to: (i) pay any mortgages (Article IV, ¶30); (ii) remove Ms. Dreier's name from the second mortgage on the Westhampton House (Article IV, ¶45-46); (iii) complete the buyout of Ms. Dreier's interest (Article IV, ¶¶62-63); pay the "add-on" expenses for the Children (Article VIII, ¶4-9) (See the general default provision at Article XXIV, ¶1(b)).[3]

*Acceleration:*
- The proceeds from the sale of the Westhampton House must first go to satisfy the mortgage and any IRS tax liens on that property (defined as the Westhampton House Liabilities at Article IV, ¶25), and then to the following obligations, in the following order of priority, "*even if the particular obligation has not yet come due in accordance with the payment schedule for the particular obligation…*" (Article IV, ¶32, pp. 20 - 21):
    1. Balance of House Payment
    2. Any unpaid equitable distribution
    3. Spousal support
    4. Child support obligation

*Asset Liens To Secure All Of Debtor's Financial Obligations:*
- Ms. Dreier was granted a first lien in a certain Picasso lithograph "*as further security for the Husband's obligations to make complete payment to the Wife of all financial obligations under this Agreement, including all payments of equitable distribution, spousal support and child support*." (Article V, ¶ 13). Upon Debtor's default, wife is permitted to sell the lithograph and proceeds can be used "*towards the satisfaction of all of the Husband's financial obligations under this Agreement . . .* "(Article V, ¶ 13, p.42).
- Ms. Dreier was granted a first lien in certain automobiles owned by Debtor "*as further security for the Husband's obligations to make complete payment to the Wife of all financial obligations under this Agreement, including all payments of equitable distribution, spousal support and child support*." (Article V, ¶ 20, p. 45). Upon Debtor's default, wife is permitted to sell the automobiles and proceeds can be used "*towards the satisfaction of all of the Husband's financial obligations under this Agreement . . .* "(Article V, ¶ 21, p.46).

*Receivables Lien / Acceleration Carve-out:*

---

[2] The total House Payment due Ms. Dreier for her interest in the Westhampton House is 50% of its appraised value, less 50% of the first mortgage on that house (Article IV, ¶62).

[3] Ms. Dreier similarly had the right to sell a certain Picasso lithograph and certain automobiles (Article V, ¶¶13, 20-21).

- The Divorce Agreement provides for Ms. Dreier to have a security interest in the receivables of the Husband's law firm, Dreier LLP ("Wife's Receivables Lien") to secure "all of the Husband's financial obligations to, or for the benefit of, the Wife and/or Children under [the] Agreement." (Article V, ¶5, p. 37).
- If the sale of the Westhampton House is not sufficient to satisfy all of the Husband's then remaining financial obligations "to, or for the benefit of, the Wife and/or Children under [the] Agreement," then the Wife may exercise the Wife's Receivables Lien, but only for those obligations "*then due and owing,*" and thereafter for any further obligations "*as they come due.*" (Article V, ¶9, pp. 38-39; Article IV, ¶33, p.21).

*Catch-All Remedy For Debtor's Default:*
- The Divorce Agreement provides Ms. Dreier, upon the Debtor's default of any of his financial obligations under this Agreement, with the right to seek a court order compelling the Debtor to sell or liquidate <u>other assets</u> (other than the assets specified elsewhere in the Divorce Agreement, "which do not require Court action prior to sale and/or foreclosure by the Wife"). (Art. XXIV, ¶3, p. 103).

22. The Divorce Agreement provides for the Debtor to pay child and spousal support of more than $40,000 monthly for some 15 years after the parties' divorce. The Divorce Agreement unambiguously provides that if the Debtor fails to meet those obligations, among others, Ms. Dreier can sell the Westhampton House (plus the Picasso lithograph and certain automobiles) to cover all amounts owed her and the children, <u>even if they are not yet due</u>. See Divorce Agreement, Art. IV, ¶32, pp. 20 - 21. This acceleration provision is clear on its face.

23. There is no dispute that the Debtor had defaulted in his support and maintenance obligations to Ms. Dreier prior to the commencement of his bankruptcy case. Pursuant to Article IV, ¶32, of the Divorce Agreement, the Debtor's financial obligations were accelerated upon his default. There is no provision in the Divorce Agreement to decelerate the Debtor's financial obligations, once accelerated. It is apparent that the parties intended that in the event the Debtor's equity in the Westhampton House was insufficient to cover his accelerated financial obligations, Ms. Dreier could then look to other assets of the Debtor to satisfy those obligations, subject to the express limitation applicable to the Wife's Receivables Lien, which could only be exercised against the Debtor's obligations "then due and owing" (*See* Divorce Agreement, Art.

9

V, ¶9, pp. 38-39; and Art. IV, ¶33, p.21[4]). That is, the express limitation on the use of the Wife's Receivables Lien renders it obvious that the parties had intended that other assets could be used to satisfy the Debtor's fully accelerated obligations.[5] To find otherwise would be to render the express carve-out for the Wife's Receivables Lien superfluous. Under the standard canon of contract construction *expressio unius est exclusio alterius*, that is, that the expression of one thing implies the exclusion of the other, the narrow limitation of the Wife's Receivables Lien to the Debtor's obligations "then due and owing" must clearly be understood to mean that full acceleration is applicable for all remedies other than the Wife's Receivables Lien. See In re New York City Asbestos Litigation, 838 N.Y.S.2d 76, 2007 NY Slip Op 05542 (App Div, 1st Dept 2007) (applying maxim *expressio unius est exclusio alterius* in determining scope of an indemnity clause in the governing contract).

24. As Ms. Dreier stated in the DSO Claim, by December of 2008, the Debtor was in default of at least 11 provisions of the Divorce Agreement, including his obligations to pay child support to Ms. Dreier. On December 24, 2008, Ms. Dreier issued a Notice of Default to the Debtor. As of the Debtor's involuntary petition date, his defaults under the Divorce Agreement were not remedied. Consequently, all of the Debtor's support obligations became accelerated thereby entitling Ms. Dreier to the full amount of the DSO Claim as a priority claim.[6]

---

4. The limitation of the application of the Receivables Lien to obligations "*then due and owing*" and to obligations "*as they come due*" was a discrete carve-out from acceleration heavily negotiated by Debtor to preserve the viability of his law firm and to preserve sufficient income for him to live.
5. The Catch-All remedy, set forth in Article XXIV, ¶3, provides another example of how the parties anticipated the situation where the Debtor might not have sufficient equity in the Westhampton House to satisfy the Debtor's accelerated financial obligations. The provision permits Ms. Dreier to initiate court proceedings to compel the Debtor to liquidate and sell any other assets not specifically identified in the Divorce Agreement.
6. Of the $7,105,102 included in the DSO Claim, $1,522,661 is for unpaid child support and $4,220,000 is for unpaid support and maintenance of the ex-wife. The Balance of the DSO Claim, $1,362,441, is for other obligations of the Debtor to Ms. Dreier provided under the Divorce Agreement, including Life Insurance Payments, Home and

**2. Extrinsic Evidence Demonstrates That The Debtor And Ms. Dreier Intended The Divorce Agreement To Provide For Acceleration Of The Debtor's DSO Obligations**

25. Even if the Court determines that the Divorce Agreement, on its face, does not literally provide for acceleration of the Debtor's DSO Obligations, there is substantial evidence which the Court can and should consider demonstrating that the Debtor and Ms. Dreier had intended, at the time they executed the Divorce Agreement, that the Debtor's DSO Obligations would be subject to acceleration.

26. The fundamental rule in the construction of all agreements is to ascertain the substantial intent of the parties. Private Client Group v. Markey, 2010 NY Slip Op 31038[U] (NY Sur Ct Apr. 15, 2010) (2010 BL 99550) (internal citations omitted). If it is claimed by a party that a construction should be placed on the contract other than has been indicated, or any doubt arises from the writing itself, the court must look into the intention of the parties. Those intentions are to be derived not alone from the words used but, insofar as the words may be ambiguous in the light of the surrounding facts and circumstances, extrinsic evidence may be introduced as to those facts and circumstances without violating the parol evidence rule. Id. (internal citations omitted); See also Hudson-Port Ewen Assocs. v Kuo, 78 NY2d 944, 945 (1991); O'Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50, 55-56 (1939).

27. If permitted to testify on this matter, Ms. Dreier will testify that prior to executing the Divorce Agreement, she and the Debtor directly (rather than through counsel) negotiated many, if not most, of the key terms of the Divorce Agreement. By late July, 2003, they had reached an agreement on the essential terms of the agreement. One of the terms they reached agreement on was that all of the Debtor's DSO Obligations (with limited exception) arising

---

Auto Insurance, Equitable Distribution and Attorneys Fees. *See* DSO Claim, including the schedule and calculation

under their anticipated divorce agreement would be subject to acceleration following the Debtor's default. Their agreement was memorialized in a written term sheet (the "Term Sheet") which both the Debtor and Ms. Dreier executed on July 28, 2003.[7] A true and accurate copy of the Term Sheet is annexed hereto as Exhibit "B." The Term Sheet unequivocally demonstrates that the Debtor and Ms. Dreier had reached an agreement that the Debtors' DSO Obligations would be subject to acceleration.

28. Section IV of the Term Sheet, titled "Penalties for Late Equitable Distribution, Spousal Support and Child Support Payments; Security for Equitable Distribution and Spousel Support Payments" includes express language pertaining to acceleration. That section provides, in relevant part, that if a default in the payment of Equitable Distribution, Spousal Support or Child Supports is not timely remedied, then

> [T]he entire balance of the monthly support payments (both Spousal Support and Equitable Distribution payments) will be accelerated (and will bear interest at the statutory rate. In addition, [Ms. Dreier] may exercise her collateral rights, including the immediate sale of the House as well as the sale of the 2 Mercedes automobiles which [Debtor] will retain (the 500SL and 500S), with the entire net proceeds payable to [Ms. Dreier] against the accelerated debt plus interest. There will be no remedies or option to cure available to [Debtor] if any payment he is required to make is late beyond the terms set forth above.

See Term Sheet, Section IV, p. 10 (emphasis added).[8]

29. Further, Ms. Dreier will testify that while there were further negotiations following execution of the Term Sheet, the parties did not intend to alter their original agreement

---

of amounts due annexed thereto.
7. Should the Court determine that an evidentiary hearing is appropriate to resolve factual issues pertaining to the Claim Objection, she will be prepared to testify and offer evidence as to her and the Debtor's intentions with respect to the terms of the Divorce Agreement.
8. The inclusion of the term "Equitable Distribution" in the parentheses is in the quoted language from Art. IV of the terms sheet was inadvertent. Clearly, the term "Child Support" should have been used in place of "Equitable Distribution" and the term "Equitable Distribution" should have followed the parentheses. This error is obvious insofar as the language inside the parentheses is intended to explain the preceding term "monthly support payments,"

12

(as set forth in Art. IV of the Term Sheet) concerning the acceleration of the Debtor's support obligations following his default. She believed, at the time she executed the Divorce Agreement, that the Divorce Agreement adequately provided for full acceleration of the Debtor DSO Obligations.[9]

30. Notably, finding that the Debtor and Ms. Dreier had intended the Divorce Agreement to provide for acceleration of the Debtor's DSO Obligations would not contradict any existing provision in the Divorce Agreement, nor would it render any provision or term superfluous. On the other hand, finding that the agreement does not provide for acceleration of the DSO Obligations would render the express carve-out for the Wife's Receivables Lien superfluous. Consequently, evidence of the parties' negotiations leading up to execution of the Divorce Agreement, including the contents of the Term Sheet, can be considered by the Court without violating the rule against parol evidence. See Private Client Group v. Markey, 2010 NY Slip Op 31038[U], supra.

31. The Term Sheet, which supports Ms. Dreier's position that it was the parties' intent to provide for acceleration, demonstrates that she is not "engaging in revisionist history" as the Trustee contends. See Claim Objection, ¶ 49. On the other hand, it is the Trustee, who was not a party to the Divorce Agreement and who has no personal knowledge as to the facts and circumstances surrounding the negotiation and execution of that agreement, that is trying to re-write history. He has no basis to refute the evidence (including the Term Sheet) demonstrating that the Debtor and Ms. Dreier had intended acceleration of the Debtor's DSO Obligations.

---

which could only include Spousal Support and Child Support."

9 Although both Ms. Dreier and the Debtor were represented by matrimonial attorneys in connection with their divorce proceeding, they both assumed direct responsibility for most of the negotiating and drafting that lead to the final version of the Divorce Agreement. Consequently, they are the best witnesses as to the intent and meaning of the provisions of that agreement.

32. The Trustee contends that acceleration clauses and notices of acceleration should be clearly stated and that the lack of clarity in the Divorce Agreement concerning such clause militates against acceleration. See Claim Objection, ¶ 49. However, the cases cited and relied upon by the Trustee (none of which apply New York law) all concern the acceleration of debt in the mortgage foreclosure context. Under New York law, outside of the mortgage foreclosure context, there is no authority to support the Trustee's assertion of a heightened standard of any kind for acceleration clauses. The concerns which warrant a heightened standard in the context of mortgage foreclosure simply are not present here and the Trustee can point to no authority stating otherwise.

33. The Trustee further argues in his Claim Objection that Ms. Dreier's prior attempts to challenge the terms of the Divorce Agreement, which were not successful, demonstrate that Ms. Dreier's position concerning acceleration of the Debtor's DSO Obligations is "just another bid by her to rewrite the agreement." The Trustee either misunderstands or mischaracterizes the prior litigation concerning the Divorce Agreement. That litigation did not involve a dispute as to the meaning of the provisions of the Divorce Agreement. Rather, it involved Ms. Dreir's contentions (which turned out to be completely true) that the Debtor had issued fraudulent financial statements in which he misrepresented, among other things, his income and assets. The Matrimonial Court would not permit Ms. Dreier to reopen discovery to investigate the Debtor's fraud. Undoubtedly, in light of the subsequent discovery of the Debtor's extensive fraud and criminal behavior (for which his now serving time in a federal penitentiary), the Matrimonial Court would likely now be far more open to Ms. Dreier's allegations of fraud. In any event, contrary to the Trustee's suggestion, Ms. Dreier's prior challenge to the Divorce Agreement simply has no bearing at all on the matters put in issue in the Claim Objection.

# IV. CONCLUSION

34. For the foregoing reasons, the Trustee's Claim Objection, to the extent that it pertains to the disallowance and reclassification of the Ms. Dreier's claim arising from the Debtor's accelerated DSO Obligation, should be denied.

Dated: New York, New York
September 7, 2010

PRYOR CASHMAN LLP

By: */s/ Robert M. Fleischer*
Mark R. Jacobs (MJ-6248)
Robert M. Fleischer (RF-9099)
Seth H. Lieberman (SL-4880)
7 Times Square
New York, New York 10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
mjacobs@pryorcashman.com
rfleischer@pryorcashman.com
slieberman@pryorcashman.com

Attorneys for Elisa P. Dreier

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| MARC S. DREIER, | ) Chapter 7 |
| | ) |
| Debtor. | ) Case No. 09-10371 (SMB) |
| | ) |

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that on September 7, 2010, the document listed below (the "Filings") was filed electronically via the Court's CM/ECF System.

- OBJECTION OF ELISA P. DREIER TO CHAPTER 7 TRUSTEE'S MOTION UNDER RULE 3007 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE SEEKING ENTRY OF AN ORDER: (I) DISALLOWING A PROTION OF CLAIM 14 FILED BY ELISA DREIER; AND (II) RECLASSIFYING A PORTION OF CLAIM 14 FILED BY ELISA DREIER AS A GENERAL UNSECURED CLAIM

Electronic notice of said Filings was provided via the Court's CM/ECF System to all parties able to receive electronic notice, as indicated in the Notice of Electronic Filing. Such parties may access the Filings through the Court's CM/ECF System and such parties are directed to the electronic docket to view the filing.

Dated: New York, New York
September 7, 2010

By: */s/ Robert M. Fleischer*
Robert M. Fleischer
7 Times Square
New York, New York 10036-6569
Tel: (212) 326-0556